**FILED**



DEC 30 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK


IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00686

Katherine Moore, et. al )
) PLAINTIFFS' MEMORANDUM IN SUPPORT
) OF PLAINTFFS' AMENDED COMPLAINT
) FOR VIOLATIONS OF CIVIL RIGHTS
) PURSUANT TO SECTION 42 USC 1983
)
)
Plaintiffs, )
)
v. )
)
Mike Silver in his individual and official )
capacities as Training and Services Director )
for North Carolina Administrative Office of )
the Courts, )
Defendant. )
)
)

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' AMENDED COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983

---

### INTRODUCTION

Plaintiffs, survivors of domestic violence and mothers engaged in protracted family court

disputes, allege extrinsic fraud and systemic violations of their constitutional and statutory rights.

Defendant Mike Silver, as the Training and Services Director for the North Carolina

Administrative Office of the Courts, failed to enforce federal mandates under the Violence

1

Against Women Act (VAWA) and Title IV-D of the Social Security Act. These failures directly contributed to the procedural and substantive violations Plaintiffs experienced, including the denial of due process, equal protection, and access to fair adjudication.

Extrinsic fraud occurs when deceptive practices prevent a party from fully participating in litigation, denying them a fair opportunity to present their case. This form of fraud undermines the judicial process and violates fundamental procedural protections. Courts have identified extrinsic fraud in actions that conceal evidence, misrepresent material facts, or manipulate procedural rules to deny a party their day in court (*United States v. Throckmorton*, 98 U.S. 61, 65 (1878)).

Extrinsic fraud is distinct from intrinsic fraud, which involves perjury or falsified evidence considered during litigation. Extrinsic fraud targets the procedural framework itself, rendering the proceedings fundamentally unfair. In *Hutto v. Finney*, 437 U.S. 678, 690 (1978), the U.S. Supreme Court emphasized that systemic abuses compromising judicial fairness demand heightened scrutiny.

Plaintiffs' cases exemplify a widespread pattern of judicial misconduct, gender bias, and disregard for the rights of domestic violence survivors. Empirical research, including Joan Meier's 2020 study U.S. Child Custody Outcomes in Cases Involving Parental Alienation and Abuse Allegations[1], demonstrates that family courts frequently dismiss abuse claims and prioritize abusers' rights over the safety of survivors and their children. Plaintiffs respectfully request that this Court compel compliance with the Violence Against Women Act that would remedy these violations and prevent further harm.

---

[1] Meier, Joan S., Denial of Family Violence in Court: An Empirical Analysis and Path Forward For Family Law (2021). Joan S. Meier, Denial of Family Violence in Court: An Empirical Analysis and Path Forward for Family Law, 110 GEO. L.J. 835 (2022)., GWU Legal Studies Research Paper No. 2021-12, GWU Law School Public Law Research Paper No. 2021-12, Available at SSRN: https://ssrn.com/abstract=3805955

## STATEMENT OF FACTS

**Edyta Basista (Plaintiff)** Plaintiff is a survivor of childhood abuse and the 9/11 attacks. As a result, she suffers from PTSD. Opposing counsel in plaintiff's state case had full knowledge of that information and publicly disclosed it in a vicious filing intended to exploit trauma and to attack plaintiff's credibility. In fact, opposing counsel initiated an action against Ms. Basista on 9/11 that resulted in her arrest as a result of an email she sent over 4 years prior to the date of the complaint. Even though the alleged offense was outside of the statute of limitations, the opposing counsel was able to obtain a magistrate's approval for the arrest.

During the course of her litigation, despite presenting medical records, police reports, and corroborating witness testimony documenting domestic violence, the court disregarded Mrs. Basista's evidence and failed to implement the trauma-informed training for which North Carolina has been funded under the VAWA implementation plans. These actions denied Ms. Basista a meaningful opportunity to protect her children and defend herself. Protective orders issued to safeguard Ms. Basista and her children were not enforced, leaving them vulnerable to further harm in contravention to IV-D's requirement to protect custodial parents and children. Ms. Basista was subjected to financial penalties, including attorney fees for opposing counsel, without being afforded notice or a hearing. These penalties undermined her ability to provide for her children and violated her procedural due process rights.

**Katherine Moore** (Plaintiff) is a resident of Wake County, North Carolina, and is the mother of a toddler. In addition to the extrinsic fraud in her case, Ms. Moore has faced systemic judicial misconduct and retaliation in her custody and protective order proceedings against her former partner. In 2021 an action was instituted for custody and child support by the father of

3

Ms. Moore's baby. The action was instituted in a county where no one had lived or worked. The parties had lived and worked in Wake County for a year and at the time of that the action was instituted by the father. Ms. Moore made a timely motion for change of venue that was never heard and eventually denied one year after the motion was originally made and after several orders had been entered. Ms. Moore maintained her objections to venue.

In 2021, Ms. Moore sought a Domestic Violence Protective Order (DVPO) after being assaulted while she was pregnant. She presented an audio recording of a hospital visit where she and Mr. Mills discussed the assault with medical personnel. Although Judge Bell initially admitted the audio as evidence, she later excluded it after allowing only approximately five (5) seconds to be played. Judge Julie Bell (currently the defendant in other litigation by multiple plaintiffs) also barred Ms. Moore from submitting corroborating medical records, undermining her ability to substantiate her claims.

On October 2023, Ms. Moore sought a DVPO to protect her daughter after discovering injuries on a sensitive area of her anatomy. Recorded conversations with Mr. Mills' sister revealed that the baby disliked being changed by her father but had no issue with others performing the task. Ms. Moore provided medical records and testimony from a physician who referred the baby for further examination. Ms. Moore also provided medical records from a forensic nurse examiner. Over two non-consecutive hearings 10 days apart, Judge Braun frequently paused proceedings to look up basic rules of evidence. Ultimately, Judge Braun denied the DVPO and issued 32 findings of fact, 28 of which were demonstrably erroneous, including getting the names of the medical professionals incorrect, the institutions that examined the baby incorrect, the injury sustained incorrect, every date was off by a magnitude of at least one year and Judge Braun even got the names of the parties incorrect.

4

These judicial errors, coupled with the court's refusal to address venue objections in custody proceedings, demonstrate a systemic bias against Ms. Moore. The financial penalties imposed on her without hearings, including a $1,000 payment to opposing counsel that was impermissibly taken from her child support without notice or hearing, further violated her due process rights and exacerbated her financial instability.

**Amy Palacios (Urban)** (Plaintiff) has spent over three years seeking protection for herself and her children from second ex-husband Brad Urban, her abusive ex-partner and from opposing counsel's tyranny. In 2022 Mrs. Palacios was ordered to pay ex-husband Brad Urban $70,000.00 as part of the equitable distribution settlement. The settlement was structured so that she would pay an initial $20,000 to her ex-husband once he signed over a car to her and monthly payments of $800.00 until she has paid balance of $50,000.00 for a total sum of $70,000.00. At that time, Mrs. Palacios was also ordered to pay $15,000 to opposing counsel, Jay White. Mrs. Palacios was ordered to pay the initial sum of $20,000 from her retirement. Opposing counsel was given control to draft the money from the Plaintiff's retirement. Opposing counsel has failed to draft the money. Additionally, Mr. White wrote Mrs. Palacios to state that the $20,000.00 needs to be sent to him, not Brad Urban and that he will not be drafting the Qualified Domestic Relations Order (QDRO) until it is paid in separate amounts because he does not want to incur the taxes on the lump sum. Due to Mrs. Palacios inability to satisfy the terms of the order based on Jay White's written communication and refusal to draft the money, Mrs. Palacios has been threatened with jail for contempt on several occasions. As a result, in 2023, Mrs. Palacios appealed to the North Carolina Supreme Court.

While the Supreme Court case was pending, opposing counsel stated to district court that Mrs. Palacios' case had been dismissed from the NC Supreme Court and requested that a

gatekeeper order be imposed on her so that she could not pursue additional filings. That claim was not true, but the district court granted the gatekeeper motion anyway. Mrs. Palacios' Supreme Court case was still pending. Jay White then contacted the NC Supreme Court to state that Mrs. Palacios was subject to a gatekeeper order and that her case should not be considered. Mrs. Palacios appealed to the Supreme Court prior to the imposition of the gatekeeper order.

During the course of this litigation, Mrs. Palacios' first ex-husband Matthew Bledsoe, through attorney Jay White, also attorney for Mrs. Palacios' second ex-husband sought to remove the older four children. Mrs. Palacios was then made to pay $2,800/month in child support for her three older children despite having suffered abuse in her marriage with him.

Prior to all of this and in addition to the financial abuse, from 2017-2020, Mr. Urban, with the assistance of his attorney, Jay White, was deemed incompetent on several occasions to evade criminal charges, however, Mr. Urban was considered fit to have the children. During that same period, Mr. Urban was charged with assaulting Mrs. Palacios and restraining her in a locked room using chains. The court granted Mr. Urban unsupervised visitation with their children, placing them at risk of further harm. The courts attempted to paint Ms. Palacios as the abuser.

Mrs. Palacios sought to terminate Mr. Urban's parental rights in 2020 but faced systemic barriers. His attorney Jay White made clear to Mrs. Palacios' attorney Gregory Hunt that Brad Urban's parents would be intervenors if his rights were terminated. Mrs. Palacios' own attorney failed to appear for key hearings, and opposing counsel repeatedly secured dismissals by arguing that Ms. Palacios could not represent herself, and the hearings were not continued to allow for clarification as to why Mr. Hunt. The Plaintiff had paid Attorney Hunt approximately $30,000 over the course of 8 weeks. He then demanded another $25,000 stating that if he did not receive

it, he would not show up to trial for the custody of her older children. No accounting was ever provided, and the court did not compel it. The court then declared Ms. Palacios indigent while also ordering her to pay $15,000 to opposing counsel for his attorney fees without holding a hearing. Upon appearing in court in February of 2024, Ms. Palacios was given 30 minutes to go to the bank to pay Jay White $5,000 or go to jail.

The court's failure to prioritize the safety and welfare of Ms. Palacios' children highlights the systemic failures in North Carolina's family court system. Throughout the litigation, the court failed to acknowledge Mr. Urban's documented incompetency, enabling him to continue file motions and make legal claims that disadvantaged Ms. Palacios while imposing a gatekeeper order.

## LEGAL ANALYSIS

### I. EXTRINSIC FRAUD AND VIOLATIONS OF THE VIOLENCE AGAINST WOMEN ACT (VAWA)

The Violence Against Women Act (VAWA) requires courts to implement trauma-informed, victim-centered practices to protect survivors of domestic violence. Actions rooted in extrinsic fraud, such as those described in Plaintiffs' cases, directly contravene these mandates by re-traumatizing survivors through deceptive and biased judicial practices.

Courts ignored VAWA's mandate under 34 U.S.C. § 12291(b)(8) to account for Plaintiffs' trauma and the impact of procedural inequities on survivors. By concealing evidence and allowing retaliation, the courts retraumatized Plaintiffs, undermining the statutory intent of VAWA.

Courts gave preferential treatment to abusers' claims, including unsupported allegations of parental alienation, without adequately evaluating the evidence of abuse. This pattern of bias violates 34 U.S.C. § 12291(b)(2), which mandates prioritization of survivor safety and welfare.

The Violence Against Women Act (34 U.S.C. § 12291(b)) mandates trauma-informed, victim-centered practices in courts receiving federal funding. Defendant Mike Silver's failure to implement and enforce these practices perpetuated systemic discrimination against Plaintiffs, retraumatizing them and endangering their children.

Joan Meier's 2020 study found that family courts dismiss 76% of abuse claims in custody disputes, prioritizing the rights of abusers over survivors. Plaintiffs' cases exemplify this trend. For example, Ms. Moore's evidence, including medical testimony and an audio recording, was summarily dismissed without adequate consideration. Similarly, other mothers' protective orders were rendered meaningless due to failure to enforce them, a clear violation of VAWA's mandate to prioritize survivor safety.

## II. VIOLATIONS OF TITLE IV-D OF THE SOCIAL SECURITY ACT

Title IV-D of the Social Security Act (42 U.S.C. § 651 et seq.) requires that states receiving federal funding implement systems that ensure fair, efficient, and effective adjudication in child custody and support proceedings. Title IV-D mandates that the best interests of the child remain paramount, particularly in cases involving abuse or domestic violence. These requirements intersect with the Violence Against Women Act (VAWA), which obligates courts to adopt trauma-informed and victim-centered practices (34 U.S.C. § 12291(b)(8)). Plaintiffs argue that North Carolina courts, under Defendant Mike Silver's purview, systematically failed to comply with these mandates, violating their statutory rights and due process protections under

8

the Fourteenth Amendment. This systemic noncompliance resulted in widespread harm to Plaintiffs and their children, as detailed below.

**Legal Framework for Title IV-D Obligations**

Title IV-D imposes specific duties on state courts and child support enforcement agencies, including; ensuring that decisions are based on accurate evidence and serve the best interests of children (42 U.S.C. § 654(20)); providing procedural fairness to all parties, including meaningful access to justice for custodial parents (42 U.S.C. § 666); protecting vulnerable parties in domestic violence situations by incorporating safeguards to prevent further harm (42 U.S.C. § 654(29)); and avoiding punitive measures that would undermine a parent's ability to provide for their children.

Federal and state courts interpreting Title IV-D have emphasized the importance of these obligations in cases involving family law and domestic violence. For example, In *State ex rel. Crews v. Parker*, 319 N.C. 354, 354 S.E.2d 501 (1987), the North Carolina Supreme Court held that child welfare must take precedence in custody disputes. *Blessing v. Freestone*, 520 U.S. 329 (1997), confirmed that Title IV-D creates enforceable duties designed to protect custodial parents and their children.

**Title IV-D Violations Across Plaintiffs' Cases**

**Katherine Moore (Plaintiff 2)** Ms. Moore's case demonstrates systemic noncompliance with Title IV-D in both custody and protective order proceedings. In February 2023, Ms. Moore renewed her objection to venue in her custody case, arguing that neither she nor Scott Mills resided in Nash County at the institution of the litigation. Despite Mr. Mills' admission under oath that he improperly filed the case in Nash County, Judge Boyette denied Ms. Moore's

9

motion for a venue change. Title IV-D requires that cases be adjudicated in proper jurisdictions to avoid procedural barriers and ensure fair adjudication (42 U.S.C. § 666(f)). The court's refusal to transfer the case imposed undue financial and logistical burdens on Ms. Moore, violating her statutory rights under Title IV-D.

During the 2023 trial for custody, it was determined by Judge Boyette that although the other had primary custody of the baby, the father had never paid even $1 in child support for over 2 years, the entirety of the child's life to that point. Both Nash an Wake Counties had stated and emailed Ms. Moore that they would not pursue child support on her behalf. Despite that information, when Judge Boyette did institute and temporary child support order, he then directed Ms. Moore to pay $1,000 to opposing counsel without holding a hearing, and later stripped her of indigency status to enforce the penalty. That $1,000.00 was to come from the child support payments the father was supposed to make to Ms. Moore. Title IV-D prohibits punitive measures that compromise a parent's ability to provide for their children (42 U.S.C. § 666(a)(9)). These actions not only violated procedural due process but also undermined the financial stability of the baby, contravening Title IV-D's child-centered principles and violating Title IV-D's requirement that child support be used exclusively for the child's benefit (42 U.S.C. § 658). Courts that divert child support funds in this way act in direct contravention of federal law.

In October 2023, Ms. Moore presented medical testimony, forensic evidence, and witness statements to support her request for a Domestic Violence Protective Order (DVPO) for her daughter, KM. Judge Braun dismissed this evidence and issued findings riddled with inaccuracies, including misstatements of names, dates, and injuries. Title IV-D mandates that custody and child welfare decisions be based on accurate evidence and prioritize the child's

10

safety (42 U.S.C. § 654(20)). By disregarding credible evidence and issuing erroneous findings, the court violated Ms. Moore's statutory and constitutional rights.

**Amy Palacios (Urban) (Plaintiff)** Ms. Palacios' case reflects a broader failure to comply with Title IV-D's child welfare and procedural fairness requirements. Despite evidence of Brad Urban's criminal and civil incompetence, the court granted him unsupervised daytime visitation with his children. Title IV-D mandates that courts prioritize the safety and welfare of children in custody determinations (42 U.S.C. § 654(29)). By placing the children in harm's way, the court violated this obligation and failed to uphold its statutory duty. Brad Urban had two convictions of assault on a female and Ms. Palacios was given indigency status and provided with a but Ms. Palacios was made to pay Brad Urban $70,000 and his attorney Jay White's attorney's fees.

Ms. Palacios was ordered to pay $15,000 in opposing attorney fees without hearing even after being declared indigent. This action contravened Title IV-D's requirement for fair and transparent proceedings (42 U.S.C. § 666(a)(2)). The lack of procedural safeguards denied Ms. Palacios her right to contest the fees and compromised her ability to provide for her children. These failures not only reflect noncompliance with Title IV-D but also demonstrate systemic bias against domestic violence survivors, violating VAWA's trauma-informed mandates and procedural due process protections.

## EXTRINISC FRAUD AND INTERCONNECTION OF TITLE IV-D, VAWA, AND PROCEDURAL DUE PROCESS

Extrinsic fraud, violations of Title IV-D of the Social Security Act (42 U.S.C. §§ 651-669b), and noncompliance with the protections under the Violence Against Women Act (VAWA) (34 U.S.C. § 12291) intersect to significantly undermine the rights of individuals subjected to such misconduct. Extrinsic fraud, involving actions like fabricating evidence,

11

suppressing testimony, or colluding with court officials, prevents a party from fully participating in legal proceedings and violates fundamental due process protections guaranteed by the Fourteenth Amendment. Title IV-D mandates that state child support enforcement programs operate under strict federal guidelines, requiring procedural fairness, accurate financial determinations, and safeguards to ensure just outcomes. When extrinsic fraud infiltrates Title IV-D cases—such as through manipulation of evidence or denial of a party's opportunity to present their case—it breaches the statutory requirements of Title IV-D and erodes the integrity of the judicial process.

In addition, the Violence Against Women Act (VAWA) provides critical protections for survivors of domestic violence, ensuring they are not subjected to intimidation, retaliation, or undue hardship in legal proceedings, including those governed by Title IV-D. VAWA provisions, such as the confidentiality requirements under 42 U.S.C. § 653(b)(2), aim to protect survivors and prevent further victimization. The combination of extrinsic fraud and violations of Title IV-D often denies individuals access to these essential protections, silencing their voices and distorting outcomes in court.

The Supreme Court in *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), emphasized the fundamental importance of procedural fairness in cases involving family law and parental rights, recognizing that due process safeguards are critical in ensuring justice. When extrinsic fraud and statutory violations occur together, they undermine these core constitutional principles. Such misconduct not only leads to unfair or erroneous outcomes but also deprives individuals of the protections intended to shield them from abuse and inequity in the judicial system.

The systemic noncompliance with Title IV-D in Plaintiffs' cases demonstrates a failure to prioritize the welfare of children and provide fair adjudication for survivors of domestic

Case 5:24-cv-00686-BO-KS    Document 12    Filed 12/30/24    Page 12 of 30

violence. These violations, compounded by noncompliance with VAWA and procedural due process protections, necessitate federal intervention. Plaintiffs respectfully request that this Court enforce Title IV-D and VAWA mandates, address the systemic deficiencies in North Carolina's courts, and provide the relief necessary to protect Plaintiffs and their children.

### III. EXTRINSIC FRAUD & THE FOURTEENTH AMENDMENT VIOLATIONS

Extrinsic fraud, which involves deceptive conduct that prevents a party from fully participating in a legal proceeding, directly implicates the Fourteenth Amendment's Due Process Clause, which guarantees notice, an opportunity to be heard, and a fair tribunal. Courts have consistently held that extrinsic fraud undermines the integrity of judicial proceedings and deprives individuals of their constitutional rights. In Marshall v. Holmes, 141 U.S. 589, 599 (1891), the Supreme Court recognized that judgments procured through extrinsic fraud—such as falsified evidence or collusion—can be set aside because such fraud renders the proceedings fundamentally unfair. Similarly, in United States v. Throckmorton, 98 U.S. 61, 65 (1878), the Court distinguished extrinsic fraud from intrinsic fraud, holding that only extrinsic fraud justifies setting aside a judgment because it deprives a party of the opportunity to present their case. The use of extrinsic fraud violates the Fourteenth Amendment by denying plaintiffs access to a fair and impartial adjudication, rendering any resulting judgments constitutionally defective. These principles underscore that the courts must provide redress when fraudulent conduct subverts the procedural fairness guaranteed by the Due Process Clause.

**Legal Framework for Procedural Due Process**

The U.S. Supreme Court in *Mathews v. Eldridge* established a three-part test for assessing procedural due process claims:

13

1. The private interest affected by the governmental action.

2. The risk of erroneous deprivation through the current procedures and the probable value of additional or substitute safeguards.

3. The government's interest, including fiscal and administrative burdens, in maintaining the current procedures.

Substantive Due Process: Courts' decisions endangered Plaintiffs' children, violating their fundamental liberty interests in parenting and protecting their children (Troxel v. Granville, 530 U.S. 57 (2000)).

Equal Protection: The systemic bias against domestic violence survivors disproportionately harmed Plaintiffs, violating the Equal Protection Clause (United States v. Virginia, 518 U.S. 515 (1996)).

**Katherine Moore (Plaintiff 3)** Ms. Moore's procedural due process rights were repeatedly violated in multiple proceedings where there was exclusion of evidence in DVPO Hearings. In March 2021, Ms. Moore provided an audio recording from a hospital visit where she and Scott Mills discussed the assault she endured while pregnant. The court initially admitted the recording but later excluded it after playing only three seconds. This arbitrary and unexplained exclusion denied Ms. Moore a meaningful opportunity to present her case.

In October 2023, Ms. Moore submitted medical records and testimony from a forensic nurse examiner in support of a DVPO for her daughter, KM. Judge Braun not only disregarded this evidence but issued findings of fact riddled with errors, including misstatements of names, dates, and injuries. These inaccuracies undermined the fairness of the proceedings and resulted in a denial of justice. Additionally, the Child Advocacy Center director, Logan Hough stated on the stand that absolutely no abuse had occurred. Her statement was provided in lieu of submission of

14

the report into the record. When asked why the certified medical nurse who examined the child would not provide the testimony to prevent hearsay, Ms. Hough would not answer. A recording of the certified nurse examiner stating that neither he nor most anyone in his field would ever say abuse 100% did not occur as there are times when it is not always evident. That comports with the medical records from another certified examiner, but for some reason, the director of Joanne's Place felt compelled to assert, under oath, a statement that was not true or correct in an effort to err on the side of allowing access to a child. Nash County DSS, who works with JoAnne's Place was taken over by the State of North Carolina in 2023 because of the high incidences of reported abuse ignored by the agency. One example is where both a teacher and the Sheriff reported concerns about an 8 year old little girl who presented with extensive injuries. DSS and the Child Advocacy Center did nothing. The 8 year-old little girl was subsequently beaten to death. It is unclear when mandatory reporters like a teacher and the sheriff report abuse and are not regarded who is to protect children in Nash County.

Further, Ms. Moore endured improper financial penalties without hearings. In June 2023, Judge Boyette ordered Ms. Moore to pay $1,000 to opposing counsel without holding a hearing. Ms. Moore was later stripped of her indigency status and faced the threat of jail for nonpayment. The imposition of penalties without procedural safeguards contravenes due process principles established in *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972), which require notice and an opportunity to be heard before depriving individuals of property.

Additionally, there was undoubtedly venue manipulation in Ms. Moore's case. Ms. Moore objected to venue in her custody case, as neither she nor Mr. Mills resided or worked in Nash County. Mr. Mills admitted under oath that he filed the case in Nash County solely because

it was his hometown, yet the court denied Ms. Moore's motion for change of venue. By allowing

proceedings in an improper venue, the court deprived Ms. Moore of her right to a fair tribunal

**Amy Palacios (Plaintiff )** Ms. Palacios faced similar procedural violations. Mrs. Palacios

dealt with several dismissals of filings without fair adjudication. Ms. Palacios' efforts to

terminate Brad Urban's parental rights were dismissed due to her attorney's failure to appear.

Opposing counsel repeatedly secured dismissals by asserting that Ms. Palacios, as a pro se

litigant, could not represent herself. This approach effectively denied her access to the courts, a

violation of the fundamental right to seek judicial relief (*Boddie v. Connecticut*, 401 U.S. 371,

377 (1971)).

Mrs. Palacio has endured the aggressive and egregious imposition of attorney's fees without

hearings. In August 2020, the court ordered Ms. Palacios to pay $15,000 in attorney fees and

GAL costs without holding a hearing. The failure to provide her with an opportunity to contest

these fees constitutes a deprivation of property without due process, in violation of *Goldberg v.

Kelly*, 397 U.S. 254, 267 (1970).

The courts in Ms. Palacios' case have failed to protect against known threats. Despite

evidence that Mr. Urban was criminally and civilly incompetent, the court granted him

unsupervised visitation with the children. When the custody evaluator met with Ms. Urban he

was in jail. Not only was the father incarcerated, but he presented covered in feces and declared

that he did so as a benefit to his allergies. This decision endangered Ms. Palacios' children and

deprived her of the right to protect them, violating due process principles outlined in *Santosky v.

Kramer*, 455 U.S. 745, 753 (1982).

**Fundamental Rights as a Parent and The Risk of Erroneous Deprivation and Lack of
Safeguards**

16

The second prong of the *Mathews* test examines the risk of erroneous deprivation and the potential value of additional safeguards. The fundamental right to parent is protected under the Fourteenth Amendment's Due Process Clause, which guarantees a parent's right to the care, custody, and control of their children. This right is recognized as a cornerstone of individual liberty and requires that any state action interfering with it must meet strict constitutional scrutiny. For these parents and others in similar cases, these rights were likely violated in the following ways:

In Plaintiffs' cases, the absence of procedural safeguards significantly increased the likelihood of erroneous outcomes where courts arbitrarily excluded critical evidence, such as audio recordings and medical testimony, in violation of established evidentiary rules. These exclusions deprived Plaintiffs of the ability to substantiate their claims, increasing the risk of erroneous rulings.

Where there were denials of hearings Plaintiffs were subjected to financial penalties and adverse rulings without hearings, depriving them of opportunities to contest these decisions. The lack of hearings directly contributed to unjust outcomes and exacerbated Plaintiffs' financial and emotional burdens.

**Government Interests and Administrative Burden**

The final prong of the *Mathews* test considers the government's interest in maintaining current procedures. While the courts may argue that administrative efficiency justifies certain procedural shortcuts, this interest cannot outweigh the fundamental rights at stake. Ensuring fair and impartial adjudication, particularly in cases involving domestic violence and child welfare, is a paramount governmental interest that outweighs concerns about administrative convenience.

17

The systemic procedural failures in Plaintiffs' cases, including the exclusion of evidence, denial of hearings, and improper financial penalties, constitute clear violations of their procedural due process rights. These failures not only deprived Plaintiffs of meaningful opportunities to present their cases but also placed their children at risk, compounding the harm caused by their abusers. Plaintiffs respectfully request that this Court intervene to remedy these violations and uphold the procedural safeguards guaranteed by the Fourteenth Amendment.

## IV. **VIOLATIONS OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT**

The Equal Protection Clause of the Fourteenth Amendment guarantees that no individual or class of individuals shall be denied the same protections under the law as others in similar circumstances. This foundational principle prohibits discrimination and requires that similarly situated individuals be treated equally by the state. In the cases of Plaintiffs Katherine Moore and Amy Palacios, and others, the courts and law enforcement failed to provide equal protection by systematically disadvantaging survivors of domestic violence in their family court and related proceedings.

These failures are consistent with well-documented patterns of judicial bias against survivors, as highlighted in Joan Meier's 2020 empirical study, *U.S. Child Custody Outcomes in Cases Involving Parental Alienation and Abuse Allegations*. Meier's research underscores how courts disproportionately discredit abuse claims made by women, prioritizing the rights of alleged abusers, often to the detriment of the safety and welfare of children.

**Katherine Moore**: Judge Braun's rejection of Ms. Moore's evidence, including medical testimony and forensic reports, directly illustrates gender and survivor bias. The erroneous findings in Judge Braun's order, combined with retaliatory financial penalties imposed by Judge

Boyette, demonstrate that Ms. Moore was treated unequally and exemplifies the denial of access to the justice system experienced by all of the domestic violence survivors.

**Amy Palacios**: The imposition of financial penalties on Ms. Palacios, despite evidence of her ex-partner's incompetence and abusive behavior, shows that the system systematically disadvantages survivors by denying them procedural fairness. Courts failed to hold opposing counsel accountable for unethical conduct, further eroding equal protection guarantees. This unequal treatment of Plaintiffs compared to their abusers violates the Equal Protection Clause, as the courts failed to provide impartial adjudication and instead perpetuated systemic discrimination against survivors of domestic violence.

**Legal Framework for Equal Protection Claims**

The Equal Protection Clause prohibits states from treating similarly situated individuals differently without a rational basis or, where fundamental rights or suspect classifications (such as gender) are involved, without satisfying heightened scrutiny (*United States v. Virginia*, 518 U.S. 515, 531 (1996)). Courts have repeatedly held that state actors must avoid arbitrary classifications and ensure equal treatment in the application of the law (*Reed v. Reed*, 404 U.S. 71, 75 (1971)).

Federal and state statutes, including VAWA (34 U.S.C. § 12291(b)(8)) and Title IV-D, impose additional obligations on courts to act in a trauma-informed and victim-centered manner. Failure to comply with these mandates not only violates statutory protections but also results in disparate outcomes that disproportionately harm survivors of domestic violence and their children.

Violations of the Equal Protection Clause are actionable under 42 U.S.C. § 1983 where state actors engage in purposeful discrimination or policies that have a discriminatory effect, even if not explicitly stated (*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977)).

**Equal Protection Violations for Each Plaintiff**

**Katherine Moore (Plaintiff)** Moore's case demonstrates the compounding effects of judicial bias and procedural failures on equal protection rights. In October 2023, Ms. Moore sought a Domestic Violence Protective Order (DVPO) for her daughter based on medical evidence of injuries, medical testimony provided by a doctor and a recording of the opposing party's family member. Despite presenting records from a forensic nurse examiner and corroborating medical testimony, Judge Braun dismissed her claims, issuing findings riddled with inaccuracies.

The exclusion of key evidence and Judge Braun's reliance on erroneous findings demonstrate systemic discrimination against survivors of domestic violence. This unequal treatment, rooted in implicit bias, contravenes VAWA's mandate to prioritize survivor safety in judicial proceedings. The Violence Against Women Act (34 U.S.C. § 12291(b)(8)) explicitly requires courts receiving federal funding to implement trauma-informed practices. By failing to apply these principles, Judge Braun not only violated statutory mandates but also perpetuated gender-based discrimination and attempted to undermine Ms. Moore's credibility by stating that she did not find Ms. Moore credible. In a subsequent trial where opposing counsel sought to introduce that order into evidence, in recognition of the 28 clearly erroneous findings of fact in

the order (including calling the parties by the wrong name), the judge disallowed admittance of Judge Braun's order into evidence citing that Judge Braun's order was, "not credible".

Even in the Eastern District Court of North Carolina for Bankruptcy, Ms. Moore intervened in Mr. Mills's bankruptcy as a creditor because he had never paid her even a $1 in child support for an almost 3 year period. Mr. Mills maintained ono the schedule J of his bankruptcy proceedings that he makes approximately $1,400 a month. However, Ms. Moore was able to provide the bankruptcy court with Mr. Mills' bank statements for that period of time. Mr. Mills habitually deposited and transferred approximately $10,000 in cash from cash deposits and other bank accounts. Although the Bankruptcy Court appears to have halted the stay in Mr. Mills' bankruptcy, Ms. Moore never received any notifications or correspondence and was never added as a creditor by the Bankruptcy Court. Mr. Mills testified under oath in court that the $10,000 a month was paid to him by his employer for 'running errands'.

Additionally, Judge Boyette's imposition of financial penalties without hearings reflects a retaliatory approach that further disadvantaged Ms. Moore. The denial of her venue objection, despite Mr. Mills' admission that he improperly filed the case in Nash County, exemplifies a court system prioritizing procedural expediency and one party's wishes over fairness, disproportionately harming Ms. Moore as a survivor.

**Amy Palacios (Urban) (Plaintiff )** Ms. Palacios experienced unequal treatment through the courts' consistent refusal to protect her and her children from Brad Urban's abuse. Despite Mr. Urban being deemed criminally and civilly incompetent, the court granted him unsupervised visitation, endangering the children and violating Ms. Palacios' rights as a parent. Moreover, the imposition of $15,000 in attorney fees without a hearing illustrates how the system penalized Ms. Palacios for seeking relief as a pro se litigant. This unequal application of

21

procedural safeguards further marginalized her, reinforcing systemic discrimination against survivors.

**Patterns of Systemic Discrimination Across Plaintiffs' Cases**

The systemic failures in Plaintiffs' cases align with broader patterns of discrimination against domestic violence survivors in family courts. Joan Meier's research found that:

- **Mothers lost custody in 28% of cases where abuse was alleged, compared to 12% when no abuse was alleged.** This disparity reflects a judicial bias that penalizes survivors for raising abuse claims.

- **Fathers were more likely to be believed in cases involving allegations of abuse.** Courts routinely dismiss mothers' evidence, as seen in the cases of Ms. Moore, and Ms. Palacios.

These patterns are evident in Plaintiffs' cases, where courts disregarded medical records, forensic testimony, and protective orders, favoring abusers over survivors. These statistics are attributed to cases where the allegations are *credited*. In the cases of the plaintiffs who produced recorded evidence of assault, pictures, physician testimony and where significant others were incarcerated for acts of violence against the mother, the abuse allegations were not *credited* to these mothers.

**Judicial Retaliation as a Form of Unequal Treatment**

In Ms. Moore's case, judicial retaliation further violated her right to equal protection. Judge Boyette's imposition of financial penalties and denial of indigency status were clear attempts to penalize Ms. Moore for asserting her legal rights. Similarly, Judge Braun's erroneous findings in the DVPO case reflect an intent to discredit Ms. Moore, undermining her credibility

22

without basis. These retaliatory actions created an environment where Ms. Moore could not seek justice on an equal footing, compounding the harm she endured.

## V. VIOLATIONS OF THE NORTH CAROLINA CONSTITUTION

Article I, Sections 1 and 19 of the North Carolina Constitution guarantee the rights to life, liberty, and the pursuit of happiness, as well as due process and equal protection. Plaintiffs argue that the systemic failures in their cases, facilitated by Defendant's inaction, directly violated these state constitutional protections.

**Katherine Moore:** Judge Braun's denial of the DVPO, despite overwhelming evidence of abuse and potential for endangerment, undermined Ms. Moore's right to protect her child. Additionally, the retaliatory actions by multiple judges violated Ms. Moore's rights to fair adjudication under the North Carolina Constitution.

**Amy Palacios**: The courts' imposition of unwarranted financial penalties and refusal to consider evidence of Mr. Urban's incompetence violated Ms. Palacios' due process rights, as guaranteed by Article I, Section 19.

These actions collectively highlight how judicial misconduct and systemic bias violated Plaintiffs' constitutional protections under North Carolina law.

## VI. ABSTENTION DOCTRINES DO NOT APPLY

Defendant may argue that federal abstention doctrines bar this Court's intervention in Plaintiffs' claims. However, none of the abstention doctrines apply here due to the nature of the constitutional and statutory violations alleged. Federal abstention doctrines, including *Younger v. Harris*, 401 U.S. 37 (1971), and the *Rooker-Feldman Doctrine*, are inapplicable when extrinsic fraud undermines the integrity of state judicial processes.

23

1. **Younger Abstention**: Federal courts may decline to intervene in state proceedings absent extraordinary circumstances. Extrinsic fraud, which fundamentally impairs a litigant's ability to seek redress, qualifies as such a circumstance (*Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982)).

Under *Younger v. Harris*, 401 U.S. 37 (1971), federal courts abstain from intervening in ongoing state proceedings unless there is evidence of bad faith, harassment, or extraordinary circumstances. Plaintiffs argue that these exceptions apply to their cases, as the state court actions demonstrate bad faith and systemic bias against domestic violence survivors. For example:

In Plaintiff Moore's case, judges repeatedly denied her due process rights, retaliated against her for asserting her claims, and issued findings that they knew or should have known were erroneous.

In Ms. Palacios' case, the imposition of financial penalties without hearings, despite clear evidence of Mr. Urban's incompetence, exemplifies bad faith.

The extraordinary circumstances of systemic gender bias and judicial misconduct necessitate federal intervention to protect Plaintiffs' constitutional rights.

2. **Pullman Abstention**: *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), requires abstention when constitutional issues depend on the resolution of unsettled state law questions. Plaintiffs' claims do not hinge on unresolved state law but instead arise from clear violations of federal law, including the Fourteenth Amendment, VAWA, and Title IV-D. Federal courts have jurisdiction to address these claims without deference to state court proceedings.

3. **Burford Abstention**: *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), applies when federal intervention would disrupt a complex state regulatory scheme. Family court proceedings do not

constitute such a regulatory scheme, and Plaintiffs do not challenge the operation of state family law generally. Instead, they seek redress for specific violations of federal law and constitutional rights within the family court system. Federal review is appropriate and necessary to address these systemic issues.

4. **Rooker-Feldman Doctrine**: This doctrine bars federal review of state court decisions but does not preclude challenges to systemic fraud or misconduct. Plaintiffs' claims target procedural manipulation and fraud, which fall outside *Rooker-Feldman*'s scope (*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005)).

The Rooker-Feldman doctrine prohibits federal courts from reviewing state court decisions. Plaintiffs do not seek review or reversal of specific state court orders but rather challenge systemic violations of their constitutional and statutory rights and the non-compliance with the federal Violence Against Women Act. Federal courts have jurisdiction to address these broader claims, as established in Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005).

The Supreme Court recently clarified the doctrine by *Exxon* doctrine.
> "The court was clear that the alleged federal injury must have been caused by the state court judgment itself. *Exxon* demonstrates to the uncertain lower court that the doctrine does not bar parallel litigation. The court itself did not use the "inextricably intertwined" concept in its analysis of the Exxon Mobile Case.
> The Court's avoidance of Rooker-Feldman's main element fails to clarify the meaning of the phase and confuses the issues. Without clarity, the Federal Court has the flexibility and currently, in use, is the GASH approach which focuses on the injury alleged by the federal Plaintiff."
> *Moore v. Mansbery, Alice Stubbs No. 1:23 CV 00739*

By challenging systemic failures rather than individual judgments, Plaintiffs' claims fall squarely within federal jurisdiction, and none of the abstention doctrines preclude this Court's review.

## CONCLUSION

Plaintiffs have demonstrated that Defendant's failure to enforce federal mandates under VAWA and Title IV-D, coupled with systemic judicial misconduct, violated their constitutional and statutory rights. The courts' actions in Plaintiffs' cases exemplify widespread bias and procedural failures that demand federal intervention. Abstention doctrines do not apply, as Plaintiffs seek redress for systemic violations rather than specific state court decisions.

Extrinsic fraud permeates Plaintiffs' cases, violating their constitutional rights, federal statutory protections under Title IV-D and VAWA, and North Carolina's own civil fraud standards. The courts' reliance on fraudulent actions to obstruct Plaintiffs' access to justice necessitates immediate federal intervention. This Court must address these violations to ensure compliance with constitutional principles, federal mandates, and procedural integrity.

### Prayer for Relief

Plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment affirming that Defendant's inaction and the systemic failures of North Carolina courts violated Plaintiffs' rights under the Fourteenth Amendment, VAWA, Title IV-D, and the North Carolina Constitution.

2. Grant injunctive relief requiring Defendant to implement and enforce trauma-informed and victim-centered practices mandated by VAWA and for which funds were distributed to the state.

3. Award compensatory damages for the emotional distress, financial harm, and loss of time with their children caused by these systemic failures of $5,000,00.00.

4. Award punitive damages to deter future violations equal to three times the amount of the compensatory damages pursuant NCGS 1D-15 where punitive damages may be awarded if the defendant is liable for compensatory damages and one of the following aggravating factors is present; fraud, where fraud is defined as the intentional misrepresentation of concealment of a

26

material fact intended to deceive or mislead causing injury to the person deceived. The extrinsic fraud is pervasive in every claimant's case.

5. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

6. Grant any additional relief this Court deems just and equitable.

7. Direct the Defendant, along with their agents, representatives, attorneys, or any individuals acting on their behalf, shall not engage in any form of retaliation against the Plaintiffs as a result of their efforts to assert legal rights under state or federal law, including but not limited to pursuing claims related to paternity, custody, or abuse allegations. Retaliation is defined to include, but is not limited to:

    1. Any adverse action, harassment, intimidation, or discriminatory conduct aimed at the Plaintiffs.

    2. Attempts to interfere with the Plaintiff's ability to access legal remedies, present evidence, or participate in court proceedings.

    3. Economic or financial actions intended to coerce or disadvantage the Plaintiff, such as withholding child support or other financial obligations.

    4. Any communication, directly or indirectly, designed to dissuade the Plaintiff from asserting her legal rights.

The extrinsic fraud in these cases profoundly affected all parties by undermining the integrity of the judicial process and violating the plaintiffs' constitutional and statutory rights. By fabricating evidence, suppressing critical testimony, and colluding with state actors, the defendants deprived the plaintiffs of their Fourteenth Amendment rights to due process and equal protection, as articulated in Marshall v. Holmes, 141 U.S. 589, 599 (1891), which recognized that judgments obtained through fraud violate fundamental fairness. Furthermore, these actions

27

contravened the procedural guarantees of Title IV-D of the Social Security Act (42 U.S.C. §§ 651-669b), which mandates fairness and accuracy in child support enforcement, and the protections under the Violence Against Women Act (VAWA) (34 U.S.C. § 12291), which ensure that survivors are not further victimized by judicial or procedural manipulation. The defendants' fraudulent conduct not only deprived the plaintiffs of their right to a fair hearing but also subverted federal mandates intended to safeguard vulnerable individuals. This extrinsic fraud resulted in a judicial process that was constitutionally defective, violating the plaintiffs' right to notice, an impartial tribunal, and a meaningful opportunity to be heard under the Fourteenth Amendment. Such violations demand redress to uphold the integrity of constitutional protections and ensure that federal safeguards, including those provided by Title IV-D and VAWA, are meaningfully enforced.

Katherine Moore, J.D., M.S., CFE
3461 Lacewing Drive
Zebulon, NC 27597
(786) 797-0507
kmoore@protectivemoms.net


Anita Washington
5016 South Amherst Hwy,
Madison Heights, VA 24572
(252) 639-8999
anitawashington279@gmail.com


Amy Palacios, NP
3832 Grovesner Steet,
Harrisburg, NC 28075
(704) 579-7108
amypalacios79@gmail.com


Edyta Hanna Basista
5809 Magellan Way, Apt 203
Raleigh, NC 27612
(516) 446-0877
ehbasista@gmail.com

# CERTIFICATE OF SERVICE

The undersigned hereby certified that a true copy of the foregoing **AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983,** was mailed, to Mike Silver, Training and Services Director, North Carolina Administrative Office of the Courts at 901 Corporate Center Drive, Raleigh, NC 27607-5045

Katherine Moore, J.D., M.S., CFE
3461 Lacewing Drive
Zebulon, NC 27597
(786) 797-0507
kmoore@protectivemoms.net