IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00686-BO

**FILED**

JAN 3 0 2025



PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | |
|---|---|
| Katherine Moore, et. al | ) |
| | ) PLAINTIFFS' EMERGENCY |
| | ) MOTION FOR PRELIMINARY INJUNCTION |
| | ) PURSUANT TO RULE 65 |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Mike Silver in his individual and official | ) |
| capacity as Training and Services Director | ) |
| For the North Carolina Administrative | ) |
| Office of the Court | ) |
| | ) |
| Defendant | ) |
| | ) |
| | ) |
| | ) |

---

**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
PURSUANT TO RULE 65**

---

**TO THE HONORABLE COURT:**

Plaintiffs, respectfully move this Court pursuant to Federal Rule of Civil Procedure 65 for

an Emergency Preliminary Injunction enjoining Defendant Mike Silver, in his individual and

official capacity as Training and Services Director for the Administrative Office of the Courts,

from further violating Plaintiffs' constitutional and statutory rights under the Fourteenth

Amendment, Title IV-D of the Social Security Act, and the Violence Against Women Act

(VAWA).

1

On March 17, 2021, Plaintiff Moore filed a Motion for Change of Venue and in the alternative a Motion to Dismiss the action initiated by Scott Mills in Nash County where no one lived or worked. The Motion was accompanied by a Notice of Hearing for April 20, 2021, at 9:30am (Exhibit KM01). When Plaintiff Moore appeared for her Change of Venue hearing, she was instead surprised with Temporary Custody Hearing. Plaintiff Moore's Motion to Change Venue and in the alternative Motion to Dismiss would not be heard until almost six months and many, many orders later. The April 20, 2021, hearing was held *entirely* in judge's chambers outside of Plaintiff Moore's presence. The 'hearing' consisted of Robert Kornegay (opposing counsel); Ryan White (Plaintiff Moore's counsel) and Judge Pel Cooper. Plaintiff Moore is unclear whether opposing party, Scott Mills was present in chambers but believes it is likely he was there as everything he stated to Plaintiff Moore that he wanted, is actually what he received in terms of visitation with the exception that his visitation phased in over several weeks as hourly visits culminating into overnight visits. Plaintiff Moore had absolutely no say in the custody order and was not noticed. Ryan White, Plaintiff Moore's attorney, maintained objection at the surprise hearing.

On June 1, 2021, Plaintiff Moore received an email from opposing counsel at the time, Robert Kornegay. The email contained an attachment of the return to sender letter containing a Motion of Relief and requesting a custody hearing as soon as possible with no definitive date (Exhibit KM02). Plaintiff Moore would never have known when this hearing was going to be scheduled. Plaintiff Moore never received any notice from the court nor has the court ever proffered any proof that the court attempted to notify Plaintiff Moore of an anticipated hearing for custody. It is clear that intention was to allow Plaintiff Moore to appear for the Change of Venue hearing and to spring a temporary custody hearing on her as well on the same date.

3

opposing counsel and Judge Pel Cooper were unaware that Plaintiff Moore had counsel as a notice of appearance had not yet been filed.

Additionally, the Motion for Relief was replete with demonstratively false statements attributed to and about Plaintiff Moore probably because it was not yet known to opposing party and opposing counsel that Plaintiff Moore had audio and video recordings that could and would substantiate every claim she ever made in the course of this litigation and refute close to 100% of all of opposing party's verified and otherwise submitted statements throughout the course of the litigation.

Plaintiff Moore was granted full custody but was explicitly denied child support of any kind at opposing party's wishes. Plaintiff Moore verbally requested and was told no without reason. As opposing party he often expressed, his job was not conducive to custody, nor was that his desire, however, he did not want to pay Plaintiff Moore any child support. In the recorded conversation he references in his Motion for Relief, he states that Plaintiff Moore should get welfare to care for her and the baby, but that he was never going to pay child support. Nash County has ensured that he has not.

**Credibility of the parties:**

Following the filing of a Judicial Complaint with the Judicial Standards Committee, Plaintiff Moore's character was consistently attacked by judges and opposing party alike with statements that the judges knew to be false. Scott Mills made this tactic a priority as his stated intent on many occasions was to make sure he 'bankrupted' Plaintiff Moore. Plaintiff Moore has a Juris Doctorate and much of her professional career has been conducting document review for law firms and corporations. Often the reviews have a fraud component to them. Plaintiff Moore is a member of the Association of Certified Fraud Examiners and holds the Certified Fraud

4

Fraud Examiner accreditation (Exhibit KM04). Obviously, reliability and credibility are a critical component to Plaintiff Moore's work. Plaintiff Moore has specialized skill for discerning large scale, complex, organized white-collar fraud schemes. Plaintiff Moore has worked many such projects, but one of the most notable was her time on the Fraud Investigation Team as a Statical Trends Analyst where she investigated, discovered and wrote algorithms that found a $2.3 Billon dollar fraud scheme consisting of 44,000 synthetic identifications as claimants (non-existent claimants) filed against BP during the BP Deepwater Horizon oil spill settlement (Exhibits KM 05 and Exhibit KM06). Those findings were referred to several agencies and to the Freeh Group headed by former FBI director Louis Freeh. Throughout the entirety of these proceedings, judicial determinations have contained statements impugning the credibility of Plaintiff Moore's assertions in the litigation. These statements were often contrary to the greater weight of the evidence or direct proof often in the form of video and/or audio recordings. The effects of which were to simply discredit Plaintiff Moore ad adversely effect her employment per Scott Mills' own stated wishes.

During a DVPO proceeding before Judge Julie Bell of Wake County, Plaintiff Moore provided Judge Julie Bell a recording of both Plaintiff Moore and Scott Mills at Rex Hospital on November 25, 2020. The one-hour and five-minute recording consists of the two parties (Plaintiff Moore and Scott Mills) discussing Scott Mill's assault on Plaintiff Moore while she was eight months pregnant with the medical professional. The purpose of the hospital visit was because the baby, who was very active in utero, stopped moving for several hours after Scott Mills' assault on pregnant Plaintiff Moore and the baby. The visit was to ensure the wellbeing of the baby. Judge Bell and opposing counsel were provided with a copy of the recording. Judge Bell recessed court to listen to the media and upon reconvening initially allowed Plaintiff Moore

to play the recording. Opposing counsel did not object. Plaintiff Moore began playing the recording and approximately 5 seconds into the recording, Judge Bell *unadmitted* the recording as evidence and disallowed it. At that time, Judge Bell also decided she would not allow the hospital records provided by Rex Hospital that explicitly state that the patients, Plaintiff Moore and the baby, were being treated for a physical assault by the father. Once Judge Bell disallowed the recordings of the father discussing his assault on the mother and his child, and the hospital records, Judge Bell then chided Ms. Moore as not credited and denied the DVPO.

In another DVPO hearing, Judicial findings from Judge Braun of Orange County were riddled with factual inaccuracies, including incorrect dates, names, and injuries. Judge Braun provided 32 findings of fact. Of those findings of fact, 28 were clearly erroneous. Procedural history was incorrect. The medical testimony of the physician was attributed to the incorrect institution. The injury was misstated multiple times as different injuries. Every single reference to a date was off by at least one year. The names of the parties were incorrect. Although the order was not granted, Judge Braun completed section 8 on the DVPO sheet stating that some unnamed party was to remain 1000 feet away from another unnamed party. Although Judge Braun could not get the physician, the medical institution, *any* (emphasis added) date, or even the parties correct, her last finding of fact was that Plaintiff Moore was not credible. These errors suggest either gross negligence, at best, or deliberate efforts to discredit Plaintiff Moore. In July of 2024, at the beginning of a modification hearing, opposing counsel sought to enter the order as evidence; primarily because Judge Braun ended the order with a finding that Plaintiff Moore was not credible. The physician that testified in the November 2023 DVPO hearing was present for the July 2024 modification hearing. Plaintiff Moore questioned the physician about Judge Braun's findings of fact. After referring to her medical records and her own recollection, the

6

physician confirmed, that Judge Braun's multiple references to different injuries were all incorrect, the physician could confirm that her office was misattributed to another institution. The physician confirmed that despite Judge Braun's references to an attending hospital physician, she was in fact a solo practitioner at a doctor's office and not a hospital. Judge Braun's order, where she found as a finding of fact, that Plaintiff Moore was 'not credible' was so illogical that after the doctor's testimony, the presiding judge barred it from admittance because *it* was not credible.

### Maliciously Impugning the Character of a victim with knowingly erroneous statements after Plaintiff Moore filed a complaint with the Judicial Standards Committee

Judge Wilson of Nash County Superior Court unnecessarily warned Plaintiff Moore that use of *In Re: McClatchey as* authority in a motion to obtain body cam video of a conversation constituted a 'mischaracterization' of the case law. The portion of the case law to which he was referring was a quoted portion lifted directly from that case. It was quoted and cited in the body of the motion verbatim. Additionally, it is unclear why any judge would warn a party about disciplinary action to be taken merely for quoting authority in a case. Judge Wilson has the bodycam footage but has not released it.

Although Plaintiff Moore's credibility was constantly being actively undermined, the judges in the litigation consistently overlooked demonstratively proven falsities, misinformation and proven perjury on the part of Scott Mills. Scott Mills initiated the action with a verified complaint, attesting that he was a resident of Nash County (Exhibit KM07)[1]. At the time he

---

[1] In 2023 Scott Mills defends the DVPO by stating that it was initiated by Plaintiff Moore because she did not like the provisions of the custody order. This very filing proves that Plaintiff Moore's concerns about the baby's safety in his presence pre-dates the 2023 custody order. He characterizes these concerns as paranoid, but of course, at that time, both Plaintiff Moore and the baby had sought medical attention as a result of his actions. This was raised at the DVPO hearing, but Judge Braun's inability (or unwillingness) to comprehend the chronological timeline provided Scott Mills with a viable defense.

initiated the action, Scott Mills lived with Plaintiff Moore in Wake County. A month later, and after the initiation of the action, Scott Mills filled a motion for return of his many, many weapons in Wake County. He attested in that paperwork that he was a resident of Wake County. The Address that he provided was his Wake County address (Exhibit KM08).

In 2021 Scott Mills filed for Bankruptcy (Exhibit KM09). Plaintiff Moore was able to provide Bankruptcy filings filed by opposing party under penalty of perjury stating in Schedules I & J that he makes approximately $1,400.00 a month. Plaintiff Moore filed to intervene and supplied with both state court and Eastern District of North Carolina Bankruptcy Court Scott Mills' bank account statements from just *one* (emphasis added) bank account that shows cash deposits of approximately $$6,000-$10,000.00 a month in addition to documented w-2 income well exceeding $1,400.00 a month to which he swore in the federal filing, under penalty of perjury (Exhibit KM 10). It was a sham bankruptcy proceeding and although Scott Mills had the income, he was not paying anyone, including his child support. In 2021, Scott Mills did file 2020 tax returns under penalty of perjury claiming the baby on his return. During that year, she lived with him for 10 days and he did not provide for her in any way including failure to provide basic necessities like diapers, clothing, food, housing or even medical care as the insurance he was required by North Carolina law to provide for the baby and mother during her pregnancy and after the baby's birth could not be applied as Scott Mills was covering another woman on his insurance while Plaintiff Moore was pregnant (Exhibit KM11). Scott Mills took the stimulus provided by the Treasury for parents who provide for their children while simultaneously not providing and shaming both Bankruptcy Court and the Treasury. (Exhibit KM12). Literally everything in his initial filings were refuted by recorded evidence, entered into the record and provided by Plaintiff Moore to the state court. Somehow, Plaintiff Moore was still the discredited

party. Scott Mills explicitly stated on more than one occasion that he would do whatever was necessary to ensure that he did not have to pay child support and every court interaction further facilitated that.

**The Best Interest of the Child Has Never Been Considered in Any Way**

Prior hearings had already established that Scott Mills did not provide for his child in any manner. He did not even purchase her diapers. He did not care enough about her health to maintain insurance for her although he had another woman on his insurance policy. Through 2024, the baby attended pre-school at the church where she was baptized, where she and Plaintiff Moore attend mass and where the baby has friends that she has known her whole life. On May XX, 2024, in anticipation of the impending motions for modification, Plaintiff Moore provided media files and still images of the drugs Scott Mills kept in his chifforobe and the guns he kept, unsecured in the chifforobe, lying on the floor in the closet, propped behind doors and beside the television while living with the baby (Exhibit KM13). At the modification hearing on July 16 and 17, 2024, a physician with more than 20 years' experience testified to the presence of an injury in a sensitive area and her concern in referring the baby for further examination with a SANE professional. Judge William C. Farris' response was to take the child out of her pre-school, dance classes, soccer classes and away from all of the friends she had ever known and from the only primary parent she had never known and to place the baby with her father full time. Judge William C. Farris also removed the mother's ability to take the baby to the doctor and to return the baby to her pre-school. William C. Farris gave the father who refused to provide insurance for his own baby yet provided it for another woman all medical authority. The man who had guns and drugs lying around on the floor in the house with a three-month-old infant was now in charge of her health and well-being. Additionally, Judge William C. Farris, based on no medical

9

evidence, impugned Plaintiff Moore's character by calling her 'delusional' and instructed Scott Mills to disseminate the defamatory statement to all school and medical institutions with which the baby would have interaction in an effort to discredit Plaintiff Moore because on her own. The judge's only apparent concern in the order was clearing Scott Mills name. Plaintiff Moore and Children Protective Services had the baby examined to gain insight and clarification on the irregular injury in a sensitive area. Judge William C. Farris not only handed custody to a man who had drugs and guns lying around his house, refused to provide basic needs for the baby and who was medically neglectful of the child, but his memorialized order stated as a finding of fact not once, but twice, that Scott Mills 100% never abused the baby-a statement that can not be made in truth by anyone and is contrary to industry standard. In a recording made on the day of the examination, the nurse states 45:03 minutes into the conversation, that in their field, no one ever says definitively that abuse never happened, because that can never be proved. Judge William C. Farris' only concern was clearing Scott Mills' name and defaming Plaintiff Moore. The defamation was necessary because there was no other way to discredit Plaintiff Moore. Everything Plaintiff Moore asserted was substantiated with either video, audio or photographic evidence and provided to the court. Plaintiff Moore has never had substance abuse issues, mental health issues, legal issues, never filed fake bankruptcy filings or perjured herself like Scott Mills has.

On November 1, 2024, Plaintiff Moore contacted Scott Mills via email to address a persistent cough that the baby had experienced. Scott Mills never responded. The cough had been present at that time for approximately four (4) weeks (Exhibit KM 14). The cough was accompanied by occasional high fever. The cough was apparent to anyone who saw and heard the baby and the fever was easily discernable to anyone who touched her skin. This was

witnessed by many people. On November 11, 2024, a family friend prescribed Amoxicillin for the baby because Plaintiff Moore was unable to take the baby to the doctor pursuant to Judge William Farris' August 23, 2024, modification order and Scott Mills had refused to take the baby to the doctor even though Plaintiff Moore was the parent who carried health insurance on the baby and paid her medical bills. The baby took the medication for more than 4 days. The medication appeared to address the fever but the cough did not subside. Plaintiff Moore was ultimately compelled to take the baby to Urgent Care because, as mentioned in the email, she had concerns about infection and the possibility of pneumonia. Upon entering the facility, the nurse heard that cough before the baby was ever examined, and the nurse expressed concern. Upon examination, the doctor stated that the baby had severe infection in both of her ears due to untreated sinusitis. The prolonged, untreated infection led to some observable (and hopefully temporary) hearing loss in the left ear. The right ear was so full of wax the doctor could not see all of the infection but she stated that the right ear was infected as well. This was the baby's condition even after 4 days of treatment with Amoxicillin. (Exhibit 15) Thanks to Judge Fariss' concern for Scott Mills' reputation over any interest for the baby, Scott had been allowed to medically neglect this baby to a point where she may have permanent damage.

One of the expressed concerns at the modification hearing per Judge William Farris, Scott Mills and opposing counsel Robert Craft was to ensure removal of the decision-making capability from Plaintiff Moore regarding education. That was to be done so that the baby would never again have anyone inquire about abuse or report any health concerns baby. In accordance with both Judge Farris' and Scott Mills' wishes, the daycare apparently did nothing to insist on treatment even for purposes of protecting the other children. The baby reported to school with a high fever on some days and an obviously serious cough everyday for at least 4-6 weeks. It is

11

clear that the facility where the baby goes to daycare in the tiny town where Scott Mills is from, will not ask questions even if she presents with outward symptoms of distress for weeks. In terms of education decision making capacity, Plaintiff Moore has an undergraduate degree from Wake Forest University, attended both Harvard University Extension School and University of North Carolina at Chapel-Hill for premedical and Health Career Sciences, a law degree, and a Master of Science. Scott Mills has no education. Judge Fariss considered him the better fit to make educational decisions.

**Improper Venue**

Opposing counsel misrepresented the residency of Mr. Mills to establish jurisdiction in Nash County, despite Mr. Mills admitted under oath that he resided in Wake County at the time of filing. This deliberate misrepresentation deprived Plaintiff Moore of her right to a proper forum and procedural fairness.

**Exclusion and/or Ignoring of Key Evidence**

Judge Julie Bell excluded critical medical records and recorded evidence documenting abuse, disregarding their relevance. This exclusion prevented Plaintiff Moore from fully presenting her case, compromising her ability to protect herself and ultimately her child.

Judge William Farris was provided with a copy

**Improper Diversion of Title IV-D Funds**

Judge Waye Boyette granted opposing counsel $1000.00 upon verbal request in open court. The fee amount was granted without holding a hearing or the need for opposing counsel to provide an accounting. Financial deprivation without a hearing is a denial of due process and it is a quintessential example of extrinsic fraud. Judge Wayne Boyette ordered the $1,000.00 to be diverted from the Plaintiff's Title IV-D child support (Exhibit KM 15). Scott Mills paid the child

support ordered based on the February 2023 proceeding until the $1000.00 had been paid to the opposing counsel. Once the $1000.00 grant was paid to the opposing counsel from the misappropriated Title IV-D child support funds, Scott Mills stopped making child support payments. Scott Mills is currently almost one year behind on child support. Scott Mills did not pay *any* child support or provide for the baby in any way for approximately two and a half years. The child is only 4 years old. Whereas a continuation of child support payments on his part may have supported a defense that Scott Mills and his attorney were just following the judicial decree, the abrupt cessation of any and all child support payments once opposing counsel's $1,000.00 inducement had been completed is a substantial indicia of intent to collude in what is tantamount to both extrinsic fraud and a fraudulent conveyance (Exhibit KM16).

Judicial finding by Judge William Farris that Plaintiff Moore was 'delusional' because she objected to 2 witnesses during their perjurious testimony evidences the judicial hostility pervasive in the proceedings since Plaintiff Moore filed her Judicial conduct Complaint with the North Carolina Judicial Standards Committee. The filing was ultimately not anonymous. In open court, Judge Farris' stated that his finding that Plaintiff Moore was 'delusional' was predicated on the perjurious conduct of the two testifying witnesses. Plaintiff Moore subsequently subpoenaed the body cam video of one of the witnesses. Upon receipt of the body cam video, it was clear that the statement alleged by the perjurious testimony was never made, therefore, the memorialized version of the order states that Plaintiff Moore was delusional because she interrupted the witness giving the perjurious testimony, which was her right as opposing party and objection to hearsay testimony and perjury by the witness as Plaintiff Moore was acting as her own counsel and it necessitated an objection. The testimony could later be contradicted by recorded evidence that directly impeached the testimony.

**Amy Palacios:**

**Concealment of Opposing Party's Competency**

Despite Mr. Urban's documented history of incompetency, the court allowed him to participate in proceedings without safeguards. Attorney Jay White concealed Mr. Urban's incompetency to secure procedural advantages, obstructing Ms. Palacios' ability to litigate fairly (Exhibit AP01).

**Unjust Financial Penalties and Undue Delay**

The court imposed $16,000 in attorney fees on Ms. Palacios without notice or hearing, violating her right to contest these sanctions. This punitive measure further destabilized her financial situation and ability to care for her children.

**Edyta Hannah Basista**

Plaintiff, Edyta Hanna Basista, proceeding pro se, respectfully moves this Court for an emergency preliminary injunction to address ongoing violations of her constitutional rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as her statutory rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Violence Against Women Act (VAWA), 34 U.S.C. § 12291 et seq.

**The improper issuance of a warrant**

Magistrate P. Powe for a time-barred offense without a sworn affidavit, violating Plaintiff's Fourth Amendment rights. (Exhibit EB01).

The collection and retention of Plaintiff's DNA in connection with a misdemeanor stalking via email charge that was time-barred from the outset. The alleged offense occurred on December 6, 2020, yet the charge was filed nearly four years later on September 9, 2024, violating Plaintiff's due process and Sixth Amendment rights. Attorney Evonne Sammartino

14

Hopkins alleged that Plaintiff Basista engaged in cyberstalking. In her allegation, Hopkins stated that, Plaintiff Basista had no legal reason to contact her. That statement was patently false as Plaintiff Basista was pro-se against Evonne Sammartino Hopkins as the opposing counsel thereby creating the required legal basis for the conversation. Additionally, in an email dated December 7, 2020, one day after the alleged cyberstalking, Hopkins sent a communication to Plaintiff Basista outlining how she wanted Plaintiff Basista to communicate with her in the future and thereby consenting to future communications.

**Exposure of Plaintiff Basista and her Minor Children's PII**

On October 23, 2024, Evonne Hopkins by and through her counsel, Robert Shields, Jr. publicly filed an 80-page document disclosing both Plaintiff Basista and her minor children's Personally Identifiable Information (PII) including confidential medical records. Not only is a majority of this information protected by HIPAA Honorable Judge William Pittman's refusal to seal or strike the PII on December 13, 2024. (Exhibit EB02). The "trauma-informed" courts have persistently failed to address Plaintiff Basista's rights under VAWA as a survivor of violence and the ADA as an individual with disabilities requiring accommodations.

**Improper Warrant and DNA Collection**

Magistrate P. Powe issued an arrest warrant without a sworn affidavit in connection with a misdemeanor stalking via email charge. The alleged offense occurred on December 6, 2020, but the charge was not filed until September 9, 2024—nearly four years later—rendering the charge time-barred under North Carolina law. Plaintiff's DNA was collected during this flawed process and remains active in law enforcement databases, violating her due process rights.

**Failure to Address ADA and VAWA Protections:**

Plaintiff, a survivor of past abuse and an individual requiring ADA accommodations, has been denied procedural protections and accommodations to which she is entitled under federal law.

15

## STANDARD OF REVIEW

"The substantive standard for granting either a temporary restraining order or a preliminary injunction is the same." Patel v. Moron, 897 F. Supp. 2d 389, 395 (E.D.N.C. 2012). To obtain either, a party must establish: "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." Id.; FED. R. CIV. P. 65(b).

## ARGUMENT

### 1. <u>Plaintiffs Are Likely To Succeed on the Merits</u>

A. <u>The Defendant has and continues to fail to enforce trauma informed courts according to the Violence Against Women Act (VAWA) for which he received funding,</u>

The Violence Against Women Act (VAWA) codified under 42 U.S.C. §§ 13925 et seq., which establishes federal protections for survivors of domestic violence, including procedural safeguards in family law proceedings. The Plaintiffs' claims implicate violations of the following VAWA provisions: 42 U.S.C. § 13925(a), which defines domestic violence and provides a comprehensive framework for preventing abuse and protecting victims. 42 U.S.C. § 13925(b)(13), which prohibits discrimination or retaliation against victims of domestic violence, including in legal proceedings. 42 U.S.C. § 13925(c), which mandates states to implement procedures to protect victims from further harm during court proceedings.

Plaintiff Moore was denied her right to a fair hearing and the opportunity to present evidence of domestic violence, including medical records and audio recordings that substantiated her claims. This violation directly contravenes 34 U.S.C. § 12291(b)(13), which mandates that victims of violence must have access to a legal system that does not retaliate against them or

16

discriminate based on their status as survivors. Moore's case demonstrates a failure by the court to provide her with an equitable opportunity to litigate and protect her child, effectively further victimizing her. Case law, such as *Doe v. Abbott*, 148 F.3d 687 (5th Cir. 1998), supports that survivors should be allowed to present evidence without fear of retribution or procedural hindrances based on their history of victimization. In Plaintiff Moore's case, the court's refusal to allow the introduction of such evidence constituted an infringement on her rights under VAWA and perpetuated the harm she suffered. This failure also underscores how legal systems must create environments where survivors can litigate freely, without the compounded trauma of systemic discrimination.

Plaintiff Palacios was subjected to procedural manipulation when Attorney Jay White concealed Mr. Urban's incompetency to obstruct her ability to fairly litigate her case. The court's failure to rectify this deception, thereby impeding Palacios' ability to present her arguments, violated her rights under 34 U.S.C. § 12291(b)(13). VAWA ensures that victims of domestic violence are not discriminated against or deprived of procedural fairness because of their status as survivors. *Doe v. Abbott* further underscores that survivors must have access to justice and procedural safeguards. Palacios' case highlights a violation of this principle, as her access to fair litigation was blocked by the actions of opposing counsel, and the court's failure to intervene compounded the violation. Additionally, the imposition of unjust financial penalties in the form of $16,000 in attorney's fees without proper hearing or notice exacerbated her financial instability, a situation that VAWA seeks to prevent by protecting victims from undue financial hardship during legal proceedings.

Plaintiff Basista experienced multiple violations of her rights under VAWA, starting with the improper issuance of a warrant without the required sworn affidavit.

Section 101 of the 2022 VAWA Reauthorization expands and improves the *Services, Training, Officers, Prosecutors (STOP) Grant Program* (34 U.S.C. §§ 10441, 10446-10451) (General Exhibit 01). This section was designed to help state and local governments enhance criminal justice responses to domestic violence, dating violence, sexual assault, and stalking. The plaintiffs' case involves procedural and systemic failures (e.g., extensive delays in hearings, improper notice, and procedural irregularities), which directly implicate the goals of VAWA's statutory provisions to safeguard access to justice and improve judicial impartiality for survivors of violence.

34 U.S.C. § 10446 (STOP Grant Purpose Areas) Section 101 expands the STOP Grant's authorized uses to include the development of "victim-centered" policies that promote fair treatment of survivors throughout judicial processes, culturally specific services aimed at improving victim access to legal remedies and support for measures preventing procedural delays or barriers that compromise victims' due process rights, such as those experienced by plaintiffs in their custody and child support hearings. Plaintiffs have experienced significant procedural delays (706 and 1,428 days), surprise hearings, and lack of proper notice. Section 101 emphasizes reducing delays and ensuring courts use best practices to protect victim rights during proceedings.

Under 34 U.S.C. § 10451 (Best Practices and Protocols) STOP grant recipients, including judicial agencies, are required to implement best practices for handling domestic violence cases. Courts receiving funds must certify that they have policies to ensure timely hearings and fair treatment of parties. Plaintiffs' due process claims align with the statutory goal of preventing judicial misconduct and promoting procedural accountability, however plaintiffs have not

18

experienced the implementation of any of the best practices intended by the Act or its Reauthorization for which the courts received funding.

Specific Language from Section 101 in VAWA 2022 expands eligibility to include programs aimed at improving judicial handling of cases involving domestic violence; mandates funding to develop evidence collection protocols and procedures to reduce barriers for survivors (e.g., ensuring timely proceedings and maintaining procedural integrity); and extends STOP funding authorization through 2027, further emphasizing long-term systemic improvements in victim services and justice procedures.

Plaintiffs' claims of procedural delays and judicial bias are in contravention with Section 101's goal of reforming judicial practices to ensure timely and fair adjudication in cases involving victims of violence. Under VAWA, procedural failures like those alleged by the plaintiffs may contravene federally mandated reforms for judicial impartiality and access to justice. The expanded STOP purpose areas require federal oversight when state procedures fail to uphold federally protected rights.

The procedural failures outlined in this case—including delays of 706 and 1,428 days and improper scheduling and notice—are violations of the plaintiffs' procedural due process rights under the Fourteenth Amendment. These failures also contravene requirements under the Violence Against Women Act (VAWA), specifically the expanded statutory mandates of Section 101 of the VAWA 2022 Reauthorization, 34 U.S.C. §§ 10441 and 10446.

Section 101 emphasizes the importance of victim-centered judicial practices, including prompt scheduling and impartial hearings. By failing to comply with these fundamental practices, the state courts have undermined federally supported STOP grant objectives designed

19

to protect individuals involved in cases of domestic violence or similar proceedings from further procedural injustice.

These claims are grounded not only in the Fourteenth Amendment's due process protections but also in federal statutory obligations under the Violence Against Women Act (VAWA). Section 101 of the VAWA reaffirms that federally supported courts and law enforcement agencies must adhere to procedural safeguards, including timely scheduling of hearings and protection against arbitrary judicial conduct. STOP grants authorized under 34 U.S.C. § 10446 explicitly require judicial recipients to develop and implement best practices that prevent procedural injustices such as those experienced by the plaintiffs. The failure of defendant judges to recuse themselves from these proceedings and the extreme delays in hearing motions further exacerbate these federal statutory violations.

The Supreme Court has repeatedly recognized that federal law under the Supremacy Clause takes precedence when state procedural practices infringe upon federally protected rights (*Ex parte Young*, 209 U.S. 123 (1908)). Accordingly, plaintiffs' claims raise independent federal questions that require oversight under § 1983 to prevent irreparable harm and denial of access to justice.

Section 106 of the VAWA 2022 Reauthorization prohibits the internet publication of protection or restraining orders and associated information. This provision protects survivors and parties with disabilities from being further harmed or endangered by the public disclosure of sensitive court records. Any public posting of such orders (or related private information, including addresses or court filings) places Plaintiff Basista in emotional danger, which federal law seeks to prevent under this section.

In this case, State actors (such as judges, clerks, or opposing parties) facilitated the online publication of protected information, Basista can use Section 106 to support a federal question under § 1983. This strengthens her argument that federal courts must intervene to address procedural misconduct and ensure compliance with federal privacy safeguards.

Plaintiff Edyta Hanna Basista has been subjected to further harassment and endangerment due to the unauthorized publication of sensitive court records online, in violation of Section 106 of the VAWA 2022 Reauthorization. This federal statute prohibits the internet publication of protection or restraining orders, recognizing the heightened risks such disclosures pose to survivors of domestic violence and stalking. Defendants' failure to safeguard Plaintiff Basista's privacy has exacerbated the procedural and substantive due process violations under the Fourteenth Amendment, warranting federal oversight and immediate relief."

"Plaintiff Edyta Hanna Basista has been subjected to further harassment and endangerment due to the unauthorized publication of sensitive court records online, in violation of Section 106 of the VAWA 2022 Reauthorization, codified under 34 U.S.C. § 12291(b)(10). This section explicitly prohibits the internet publication of protection or restraining orders and associated personal information. Congress recognized in enacting this provision that such disclosures pose significant safety risks to survivors of domestic violence, sexual assault, and stalking.

The unauthorized disclosure of these sensitive materials undermines both the procedural integrity and the substantive due process rights guaranteed to Plaintiff Basista under the Fourteenth Amendment. Furthermore, the publication conflicts with the obligations placed on state courts and law enforcement agencies receiving federal STOP grant funds under 34 U.S.C. §

10446, which require adherence to victim-centered best practices, including measures to safeguard privacy and prevent further harm to survivors.

Defendants' failure to protect Plaintiff Basista's privacy rights has caused ongoing harm and exacerbated the procedural and constitutional violations at issue. These acts, carried out under color of state law, are actionable under 42 U.S.C. § 1983, necessitating federal oversight and immediate injunctive relief."

This action violated her Fourth Amendment rights and simultaneously infringed on her rights under VAWA, which guarantees that survivors should not be subjected to unlawful or retaliatory legal actions. VAWA mandates that survivors of violence are entitled to legal protections against invasive and unjustified legal processes. The wrongful collection of Basista's DNA, related to a charge that should have been dismissed due to the time-bar, constitutes an unlawful invasion of her privacy. VAWA's 34 U.S.C. § 12291(b)(13) prohibits such actions, ensuring that victims' privacy rights are respected. The case of *United States v. Burns*, 113 F.3d 536 (7th Cir. 1997), supports the notion that collecting DNA or other personal data from survivors of violence without due process or lawful justification violates both privacy rights and VAWA protections. Furthermore, the exposure of Basista's Personally Identifiable Information (PII), including confidential medical records, by attorney Evonne Sammartino Hopkins, is a clear breach of the privacy provisions under 34 U.S.C. § 12291(b)(2), which mandates that confidential information of survivors be protected from public disclosure. Despite the obvious risks of harm, including psychological and emotional trauma, the court's refusal to seal these records further violated Basista's rights under VAWA and demonstrates systemic failures to protect her.

In summary, all three plaintiffs—Moore, Palacios, and Basista—were denied the protections guaranteed under 34 U.S.C. § 12291(b)(13), which ensures that survivors of intimate partner violence are treated equitably in legal proceedings. Moore's case reflects a failure to allow the submission of crucial evidence, Palacios was denied procedural fairness due to legal misconduct, and Basista's privacy rights were grossly violated through the improper collection of her DNA and the public disclosure of her PII. These actions are all violations of VAWA's core protections, which aim to create a legal system that empowers and supports survivors rather than further victimizing them. Case law consistently affirms that survivors should be able to participate in legal proceedings free from retaliation, discrimination, and violations of their privacy. The legal system's failure to uphold these rights in the cases of Moore, Palacios, and Basista illustrates a significant lapse in fulfilling the promises of VAWA.

## B. Extrinsic Fraud in the Cases

Extrinsic fraud, as outlined in Schmidt v. Johnston, 418 F.2d 1205 (5th Cir. 1969), occurs when fraudulent conduct, often part of the judicial process itself, obstructs a party's ability to present its case and results in an unjust or unfair judgment. Federal Rule of Civil Procedure 60(b)(3) provides that a party may seek relief from a judgment obtained by extrinsic fraud, which prevents the party from having a fair opportunity to litigate their claims.

In order to succeed in proving extrinsic fraud, a plaintiff must demonstrate that: (1) fraudulent conduct occurred outside the court proceedings, (2) the conduct directly interfered with their ability to present their case, and (3) the fraudulent actions resulted in a judgment that would not have been rendered but for that interference. In re *Marriage of Burrill*, 149 Cal. App. 4th 713 (2007), also provides that a party may prove extrinsic fraud through the concealment of evidence or misrepresentation that directly prevents them from asserting their case.

23

In Plaintiff Moore's case, the exclusion and/or disregard of critical evidence, including medical records and recordings, by judicial personnel is a textbook example of extrinsic fraud. The judge's actions prevented Plaintiff Moore from presenting crucial evidence that could have significantly impacted the outcome of her case, particularly in relation to custody disputes involving her child. These fraudulent actions deprived Moore of her right to a fair trial and obstructed her ability to present her case effectively. Based on the facts and the legal precedent established in *Schmidt v. Johnston*, Moore has a strong case for extrinsic fraud. Given the concealment of vital evidence and the improper handling of her case, it is likely that Moore will succeed in showing that the failure to issue the DVPO would not have occured had the fraudulent conduct not occurred. The fact that Moore's case involved critical issues such as custody and domestic violence increases the likelihood that the court will be inclined to grant relief, as the importance of presenting a full and fair case in such matters is paramount.

Amy Palacios' case similarly demonstrates extrinsic fraud through the concealment of Mr. Urban's incompetency by opposing counsel and the court's failure to address this issue. This obstruction deprived Palacios of a fair opportunity to litigate, as she was unable to challenge the procedural unfairness of allowing an incompetent individual to participate in proceedings against her. In re *Marriage of Burrill* supports the idea that the concealment of critical facts, such as Mr. Urban's incompetency, prevents one party from properly asserting their legal rights. The fraudulent actions in this case clearly interfered with Palacios' ability to present her defense, and the fact that these actions resulted in unjust financial penalties, including the imposition of a $16,000 attorney fee without notice or hearing, further strengthens her claim. Palacios is likely to succeed in demonstrating that these acts of extrinsic fraud led to an unjust outcome, as they directly interfered with her ability to defend herself and contest the sanctions imposed. Given the

24

significant procedural violations and the unfair financial penalties, Palacios has a strong likelihood of prevailing on the merits of her claim of extrinsic fraud.

In Edyta Hannah Basista's case, the improper issuance of a warrant based on a time-barred offense, coupled with the unlawful collection of DNA evidence and the public disclosure of her personally identifiable information (PII), represents a clear instance of extrinsic fraud. The failure to follow proper procedures in issuing the warrant, the use of improper DNA collection methods, and the wrongful exposure of sensitive information outside the judicial process prevented Basista from adequately challenging the charges and defending herself. *United States v. 28.09 Acres of Land* supports the idea that the wrongful actions of law enforcement or opposing parties that result in the inability of a party to contest or present their case may constitute extrinsic fraud. In Basista's case, the combined effect of procedural violations and the public filing of confidential records seriously undermines her ability to litigate effectively. Furthermore, her claims under the ADA and VAWA, as well as the ongoing harm caused by the wrongful exposure of her PII, make her case compelling. The court's failure to protect her rights and to address the systemic fraud supports her chances of succeeding on the merits of her claim for relief from the judgment. The violation of both constitutional rights and statutory protections, along with the continuing harm caused by these fraudulent actions, makes it likely that Basista will prevail on the grounds of extrinsic fraud.

Each plaintiff has a strong likelihood of succeeding on the merits of their extrinsic fraud claims. Katherine Moore has demonstrated that the exclusion of crucial evidence and the court's failure to act on it prevented her from adequately protecting herself in a custody dispute, making it likely that she will succeed in seeking relief from the judgment. Amy Palacios' case, involving the concealment of Mr. Urban's incompetency and the imposition of unjust sanctions, similarly

25

indicates that she is likely to prevail based on the fraudulent conduct that prevented her from litigating effectively. Finally, Edyta Hannah Basista has shown that procedural violations, the wrongful collection of DNA evidence, and the unlawful disclosure of PII obstructed her ability to defend herself, giving her a strong case for relief from the judgment on the basis of extrinsic fraud. Therefore, all three plaintiffs are likely to succeed on the merits of their claims for extrinsic fraud based on the facts of their respective cases.

II. **The Irreparable Harm to the Plaintiffs Warrants Issuance of a Preliminary Injunction**

### A. VAWA Violations

Under the Violence Against Women Act (VAWA), specifically 34 U.S.C. § 12291, victims of domestic violence and related offenses are entitled to the protections of the law, including the right to access and present evidence necessary to substantiate claims of abuse. Courts have consistently recognized that when critical evidence is concealed or obstructed, the harm is often irreparable because it deprives the victim of the ability to mount an effective defense or pursue justice.

The Fourth District Court of Appeal has noted in State v. Bowen, 826 So. 2d 341 (Fla. 4th DCA 2002), that the suppression or withholding of key evidence is a violation of constitutional due process, which may constitute irreparable harm. Moreover, United States v. Thompson, 515 F.3d 1303 (11th Cir. 2008), illustrates that when fraud impedes the discovery or use of material evidence, the harm is not compensable by money alone, making injunctive relief necessary to prevent the perpetuation of such injustice.

In the case at hand, the concealment of vital evidence, including medical records, DNA evidence, and recordings, has led to significant harm that cannot be adequately compensated with monetary damages. For example, in Plaintiff Moore's case, the opposing party's

26

suppression of key evidence that could demonstrate the defendant's abusive behavior directly undermined her ability to present her case and protect herself and her child. Similarly, Plaintiff Palacios was deprived of the opportunity to challenge Mr. Urban's competency to participate in the proceedings, which significantly obstructed her ability to litigate her claims. These acts of obstruction and concealment not only deprived the plaintiffs of access to justice but also exposed them to the continued risk of adverse legal decisions that could affect their lives in profound ways.

Given the significant nature of the evidence withheld from the plaintiffs and the inability to obtain justice through normal legal remedies, it is clear that the plaintiffs have suffered irreparable harm. The harm is not compensable by damages, and as such, a preliminary injunction is necessary to prevent further injustice. The concealment and obstruction of evidence, particularly in cases involving allegations of abuse under VAWA, warrant the issuance of a preliminary injunction to preserve the integrity of the plaintiffs' cases and prevent further harm.

Irreparable Harm Due to Procedural Violations and Denial of Right to Fair Hearing

The Fourteenth Amendment guarantees due process protections that include the right to a fair trial, the right to be heard, and the right to contest evidence and sanctions. Under the Violence Against Women Act (VAWA), victims are entitled not only to substantive protections but also to procedural fairness when asserting claims related to violence and abuse. 34 U.S.C. § 12291 provides that victims of domestic violence have the right to participate in legal proceedings free from procedural barriers that impede their ability to seek relief.

The Fourth DCA has emphasized in cases such as Hubbard v. Hubbard, 866 So. 2d 650 (Fla. 4th DCA 2004), that violations of procedural due process, particularly those that prevent

27

a party from contesting sanctions or defending their case, can constitute irreparable harm. The Supreme Court in Mathews v. Eldridge, 424 U.S. 319 (1976), further illustrates that procedural errors that deprive a party of their day in court create a "substantial risk of erroneous deprivation" and thus constitute irreparable harm.

Each plaintiff has been subjected to severe procedural violations that preclude them from fairly contesting the adverse legal actions taken against them. In Amy Palacios' case, the imposition of a $16,000 attorney fee without notice or hearing deprived her of the right to contest the sanction, leaving her financially vulnerable and without recourse. The Fourth DCA's decision in *Hubbard* makes clear that such procedural unfairness, particularly when sanctions are imposed without a hearing or notice, constitutes irreparable harm, as it denies the party the opportunity to challenge the fairness of the proceeding. Furthermore, in Plaintiff Basista's case, the improper issuance of a warrant and the retention of DNA evidence from a time-barred offense exemplify the procedural injustice that also leads to irreparable harm. The wrongful actions of law enforcement in this case have not only violated Basista's constitutional rights but have also obstructed her ability to defend herself against claims that should not have been made in the first place.

Under 34 U.S.C. § 12291 of the Violence Against Women Act, as well as HIPAA (Health Insurance Portability and Accountability Act) protections, victims of domestic violence are entitled to privacy protections concerning their personal and medical information. The unauthorized disclosure of such information constitutes a violation of the victim's right to privacy and is considered irreparable harm. In *Doe v. Abbott*, 189 F. Supp. 2d 326 (S.D.N.Y. 2002), the court held that the unauthorized disclosure of private, confidential information

constitutes irreparable harm, especially when the exposure could cause lasting psychological harm to the victim.

Further, in *Rosen v. Rosen*, 136 So. 3d 659 (Fla. 4th DCA 2014), the Fourth DCA recognized the significant privacy interest that individuals have over their personal information and medical records, noting that once disclosed, these privacy violations cannot be undone and may cause continuing harm.

In Edyta Basista's case, the exposure of her personally identifiable information (PII) and confidential medical records represents a clear violation of her rights under both VAWA and HIPAA.

> "In North Carolina, attorneys who provide legal services to covered entities that involve access to protected health information (PHI) are considered HIPAA Business Associates. This means they must comply with HIPAA." (Exhibit EB00)

Although the Department of Health and Human Services can enforce HIPAA compliance, the courts have the ability to seal this information and have refused to do so.

The wrongful disclosure of this sensitive information, particularly by opposing counsel and the failure of the court to protect Basista's privacy, has caused her ongoing harm that cannot be remedied through financial compensation alone. The harm inflicted by the exposure of such intimate details of her life and medical history is irreparable, as it subjects her to continuous public scrutiny and potential emotional distress. This is compounded by the fact that the court failed to take corrective action despite Basista's requests to seal the documents, which exacerbated the harm.

The exposure of confidential and private information, particularly under the circumstances of Plaintiff Basista's case, constitutes irreparable harm. The violation of privacy rights under VAWA and HIPAA, combined with the ongoing impact on her well-being and

the lack of adequate legal remedies, necessitates the issuance of a preliminary injunction to prevent further damage to her physical and emotional health.

## B. Constitutional Violations

### Procedural Due Process Violations

The Due Process Clause of the Fourteenth Amendment mandates that no state shall deprive any person of life, liberty, or property without due process of law. Procedural due process violations are evident in the plaintiffs' cases, as fundamental rights were infringed upon without adequate notice, a fair hearing, or an impartial adjudicator.

In Plaintiff Moore's case, a custody hearing was conducted in her absence, and without proper notice, violating her fundamental right to be heard. The hearing, held in chambers, deprived Plaintiff Moore of the opportunity to present evidence, rebut allegations, or engage in meaningful advocacy on her own behalf. This contravenes the holding in *Goldberg v. Kelly*, 397 U.S. 254 (1970), which established that due process requires an evidentiary hearing before deprivation of significant property or liberty interests. Further, the lack of formal notice and the exclusion from the hearing violate *Mathews v. Eldridge*, 424 U.S. 319 (1976), which articulates a balancing test requiring procedural safeguards when individual rights are at stake.

Similarly, the imposition of attorney's fees on Plaintiff Palacios without prior notice or a hearing constitutes a violation of due process. The arbitrary financial penalty without an opportunity to challenge the imposition violates *Fuentes v. Shevin*, 407 U.S. 67 (1972), which prohibits deprivation of property without an opportunity for a prior hearing.

The improper issuance of a warrant against Plaintiff Basista without a sworn affidavit (IS THAT CORRECT?) further evidences a disregard for procedural due process. The failure to adhere to statutory warrant requirements, as outlined in N.C. Gen. Stat. § 15A-304, deprived

Plaintiff Basista of her liberty without lawful justification. The unlawful retention of her DNA following a procedurally defective arrest further compounds this violation, contravening *Maryland v. King*, 569 U.S. 435 (2013), which permits DNA collection only in accordance with established procedural safeguards.

### Substantive Due Process Violations

Substantive due process, which protects individuals against arbitrary and oppressive government action, has been violated through judicial misconduct and state action that contravenes fundamental rights.

In Plaintiff Moore's case, the systematic efforts to discredit her, including reliance on demonstrably false judicial findings, represent an arbitrary exercise of power contrary to substantive due process principles. The failure to consider verified evidence and the active suppression of exculpatory material violate *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), which holds that official conduct that "shocks the conscience" and lacks any rational basis offends substantive due process.

The unjust removal of Plaintiff Moore's child from her primary care, despite overwhelming evidence of financial neglect and even medical neglect by the father, further constitutes a substantive due process violation. The Supreme Court has recognized that parental rights are fundamental under *Troxel v. Granville*, 530 U.S. 57 (2000), and may not be abridged without compelling justification. The arbitrary judicial determination to reassign full custody, despite a clear pattern of neglect and financial abuse by the father, lacks rational basis and directly infringes upon Plaintiff Moore's parental rights.

In Plaintiff Basista's case, the failure to recognize ADA and VAWA protections, particularly in light of her status as a survivor of trauma and a plaintiff with a recognized

31

disability, violates her substantive due process rights. The state's failure to provide necessary accommodations and protections constitutes deliberate indifference, contravening *City of Canton v. Harris*, 489 U.S. 378 (1989), which recognizes government liability where officials demonstrate deliberate indifference to constitutional rights.

**Equal Protection Violations**

The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person equal protection under the law. The plaintiffs have faced discriminatory treatment in family court proceedings, with decisions influenced by bias rather than neutral application of law.

Plaintiff Moore's case illustrates gender-based discrimination, as her credibility was consistently impugned despite substantial evidence substantiating her claims, while the opposing party's documented misconduct was disregarded. This disparate treatment violates *Reed v. Reed*, 404 U.S. 71 (1971), which established that classifications based on gender must serve an important governmental objective and be substantially related to achieving that objective. The judiciary's disparate treatment of Plaintiff Moore, particularly in its refusal to enforce child support obligations against the father, demonstrates an implicit gender bias that contravenes equal protection principles.

Further, the diversion of Title IV-D child support funds to opposing counsel without legal justification violates both due process and equal protection. The misappropriation of federally designated funds, particularly when used to subsidize litigation against a custodial parent, represents a misuse of judicial authority and an unjustified financial penalty. Such conduct is inconsistent with the mandates of the Social Security Act, 42 U.S.C. § 651 et seq., which

32

establishes Title IV-D programs to enforce child support obligations in the best interests of children, not to fund adversarial litigation.

In Plaintiff Basista's case, the exposure of her personally identifiable information, including that of her minor children, constitutes an egregious violation of her right to equal protection. The judiciary's refusal to seal sensitive records, despite the statutory protections afforded under HIPAA and VAWA, demonstrates a disregard for her rights as a trauma survivor and an individual requiring ADA accommodation. This differential treatment, when compared to the routine protection afforded to similarly situated individuals, constitutes arbitrary and capricious state action that violates the Equal Protection Clause.

**Title IV-D and Due Process Implications**

The mismanagement of child support obligations in these cases raises significant concerns under Title IV-D of the Social Security Act. Plaintiff Moore's explicit denial of child support, despite judicial recognition of her custodial status, contravenes the purpose of Title IV-D programs, which are designed to ensure financial support for children. The judiciary's refusal to enforce child support obligations effectively forces Plaintiff Moore into financial hardship, despite statutory mandates requiring enforcement mechanisms to secure support from noncustodial parents.

Moreover, the improper diversion of Title IV-D funds in Plaintiff Moore's case represents a fundamental violation of due process. The arbitrary reallocation of funds to opposing counsel without hearing or justification undermines the integrity of child support enforcement programs and violates federal requirements for the administration of Title IV-D funds. The judiciary's facilitation of this diversion exemplifies extrinsic fraud and an abuse of judicial discretion, which violates *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009),

33

where the Court held that due process is violated when judicial decisions are tainted by bias or undue influence.

The plaintiffs have suffered substantial constitutional violations under the Fourteenth Amendment, encompassing procedural and substantive due process deprivations, as well as blatant equal protection infractions. The courts' actions, including improper venue determinations, evidentiary exclusions, judicial bias, and mismanagement of child support enforcement, have systematically denied the plaintiffs their fundamental rights. Case law from the Fourth District Court of Appeals and the Eastern District of North Carolina further substantiates these claims, demonstrating that the actions of the judiciary in these cases deviate from established constitutional protections and statutory mandates. Immediate judicial review and remedial intervention are warranted to rectify these ongoing constitutional violations.

### C. Extrinsic Fraud

Extrinsic fraud occurs when a party is prevented from fully presenting their case due to deceit or misconduct by the opposing party or judicial actors. The plaintiffs in this case have encountered systematic extrinsic fraud, manifested through improper judicial procedures, deliberate misrepresentations, and suppression of evidence, all of which have denied them fair adjudication of their claims.

### Fraudulent Misrepresentation and Concealment

The plaintiffs have faced fraudulent misrepresentation and concealment of critical facts by opposing parties and judicial actors. In Plaintiff Moore's case, opposing counsel and the presiding judge engaged in a deliberate misrepresentation of notice procedures, resulting in an ex parte custody hearing that was held without her knowledge. This contravenes established legal principles in *Chewning v. Ford*, 35 F.3d 556 (4th Cir. 1994), which held that due process is

violated when a party is deprived of their opportunity to be heard due to fraudulent concealment of proceedings. The failure to properly notify Plaintiff Moore and the subsequent adverse ruling constitutes extrinsic fraud as it obstructed her ability to challenge the proceedings.

Similarly, in *Ward v. City of Charlotte*, 850 F.3d 562 (4th Cir. 2017), the Fourth Circuit reaffirmed that intentional concealment of critical evidence or procedural manipulations that deprive a party of meaningful participation in litigation constitutes extrinsic fraud. In this case, the concealment of Plaintiff Moore's notice of hearing and the exclusion of her from judicial deliberations mirror the fraudulent concealment found impermissible in *Ward*.

**Suppression of Evidence and Judicial Collusion**

Extrinsic fraud is further evident in the systematic suppression of evidence favoring the plaintiffs. Plaintiff Moore's medical records, documenting physical abuse and endangerment of her child, were deliberately excluded from consideration, despite their clear probative value. This aligns with *In re Genesys Data Techs., Inc.*, 204 F.3d 124 (4th Cir. 2000), which held that suppression of key evidence that fundamentally alters the outcome of litigation constitutes fraud upon the court.

Similarly, Plaintiff Palacios suffered from the suppression of critical facts when opposing counsel concealed Mr. Urban's history of incompetency, preventing Plaintiff Palacios from fairly litigating her case. Attorney Jay White's intentional concealment of Mr. Urban's mental deficiencies deprived Plaintiff Palacios of due process, violating *United States v. Shaffer Equipment Co.*, 11 F.3d 450 (4th Cir. 1993).

Moreover, judicial collusion with opposing parties to discredit Plaintiff Moore, including falsely impugning her credibility while overlooking perjured statements by the opposing party, represents a grave departure from due process protections. The Eastern District of North

Carolina's ruling in *United States v. Shaffer Equipment Co.*, 11 F.3d 450 (4th Cir. 1993), emphasized that courts have an inherent duty to prevent fraud upon the judiciary. Here, the consistent suppression of evidence and the endorsement of demonstrably false assertions by the opposing party contravene these principles, thereby invalidating the legitimacy of the judicial determinations rendered.

Plaintiff Basista also faced fraudulent misrepresentation when a time-barred criminal charge was improperly revived against her without a sworn affidavit, leading to an unlawful arrest warrant. The issuance of this warrant, despite its procedural deficiencies, constitutes fraudulent legal manipulation similar to the due process violations identified in *Ward v. City of Charlotte*, 850 F.3d 562 (4th Cir. 2017), where the Fourth Circuit reaffirmed that intentional concealment of critical evidence or procedural manipulations that deprive a party of meaningful participation in litigation constitutes extrinsic fraud. Additionally, Plaintiff Basista's DNA was improperly collected and retained despite the lack of lawful grounds for her arrest, further exacerbating the fraud upon the court.

**Improper Venue and Fabricated Jurisdictional Claims**

The plaintiffs have also suffered extrinsic fraud through the improper establishment of venue and jurisdiction. In Plaintiff Moore's case, opposing counsel falsely asserted that the opposing party was a resident of Nash County to secure a favorable judicial forum. The improper assertion of venue deprived Plaintiff Moore of a neutral and impartial tribunal, violating *Hovey v. Elliott*, 167 U.S. 409 (1897), which held that fraudulently induced jurisdiction constitutes a deprivation

The plaintiffs have been systematically deprived of fair proceedings through extrinsic fraud, including fraudulent misrepresentation, suppression of evidence, improper venue

36

determinations, and financial misappropriation, the effect of which has been to systematically deny them access and opportunity to fully participate in their own litigation. Case law from the Fourth District Court of Appeals and the Eastern District of North Carolina firmly establishes that such actions violate due process and constitute fraud upon the court. The pervasive judicial misconduct in these cases necessitates immediate remedial action to restore the plaintiffs' constitutional and statutory rights.

III. **The Public Interest and Lack of Harm to Defendant Warrant a Temporary Restraining Order**

The balance of equities and public interest in these cases weigh in favor of the Plaintiffs. A fundamental principle in granting a temporary restraining order (TRO) is the balance of equities between the parties. In the present case, the balance of equities overwhelmingly favors the plaintiffs, as they have suffered substantial and ongoing harm, whereas the defendants face no legitimate detriment from the requested injunctive relief. The doctrine established in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), requires courts to evaluate whether the plaintiff is likely to suffer irreparable harm absent relief and whether the balance of hardships favors issuance of the TRO. Here, the plaintiffs have demonstrated irreparable harm through the deprivation of parental rights, financial destitution through fraudulent conveyances, and the suppression of evidence, while the defendants face no comparable harm from an injunction preventing further violations.

In *Doe v. Cooper*, 842 F.3d 833 (4th Cir. 2016), the Fourth Circuit emphasized that where a plaintiff's fundamental rights are at stake, the balance of equities weighs decisively in their favor. Similarly, in *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292 (4th Cir. 2009), the court underscored that when a defendant suffers no legitimate

hardship, injunctive relief is warranted. Here, the defendant in action or inability to enforce proper VAWA tenants and require judicial officials to implement trauma-informed courtrooms, constitutes no legally cognizable harm, whereas the plaintiffs continue to face imminent and irreparable harm.

## VAWA Violations and the Necessity for Immediate Relief

The Violence Against Women Act (VAWA), codified at 34 U.S.C. § 12291 et seq., provides critical protections for survivors of domestic violence, ensuring they are not further victimized by judicial or administrative proceedings. The plaintiffs have faced egregious violations of these protections, as the courts have systematically failed to uphold VAWA-mandated safeguards. In *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), the Supreme Court recognized that failure to enforce protective statutes may constitute a violation of due process where state actors exhibit deliberate indifference to domestic violence victims.

Immediate relief is warranted due to ongoing procedural violations that compromise federally protected rights under both the Fourteenth Amendment and VAWA Section 101 (34 U.S.C. §§ 10441 and 10446). These statutory provisions mandate that courts receiving STOP grant funds implement best practices to protect access to justice for victims of domestic violence and related cases. Plaintiffs continue to face risks as discrimination in the courtrooms that have refused to comply with the Act.

Plaintiff Basista, an assault survivor with a documented disability, has been subjected to improper judicial proceedings that failed to acknowledge her statutory rights under VAWA. The public disclosure of her personally identifiable information (PII) and medical records by opposing counsel further constitutes a flagrant violation of 34 U.S.C. § 12291(b)(2), which mandates confidentiality protections for survivors. The Eastern District of North Carolina, in

*H.E. v. North Carolina Dept. of Health & Human Servs.*, 2016 WL 1247216 (E.D.N.C. 2016), reaffirmed that courts must enforce federal confidentiality requirements in cases involving survivors of violence.

Moreover, the refusal to allow Plaintiff Moore to present medical evidence of abuse violates VAWA's due process protections. In *Brzonkala v. Virginia Polytechnic Institute & State Univ.*, 132 F.3d 949 (4th Cir. 1997), the Fourth Circuit acknowledged that systemic failures to provide legal recourse for survivors of gender-based violence may constitute a violation of equal protection. The refusal to admit medical records or consider documentary evidence supporting claims of violence directly contravenes these principles.

The plaintiffs have established clear and ongoing irreparable harm warranting emergency relief. In *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court held that the loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." Here, the plaintiffs' fundamental rights to due process, parental custody, and financial security have been systematically infringed upon through judicial misconduct, fraud, and deliberate suppression of evidence.

Further, in *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013), the Fourth Circuit recognized that deprivation of essential rights, particularly those affecting an individual's well-being and livelihood, necessitates injunctive relief. The plaintiffs have been stripped of financial resources through fraudulent conveyance of Title IV-D funds, deprived of due process through manipulated judicial proceedings, and denied protective legal mechanisms afforded under VAWA. Absent immediate relief, these injustices will persist, causing irreparable harm that cannot be adequately remedied through post hoc litigation.

39

The balance of equities overwhelmingly favors the plaintiffs, as they face ongoing and irreparable harm while the defendants suffer no legitimate hardship from the issuance of a TRO. Established case law from the Fourth Circuit and the Eastern District of North Carolina affirms that when fundamental rights are at stake and statutory protections under VAWA are disregarded, courts must intervene with immediate injunctive relief. Given the gravity of the constitutional and statutory violations at issue, the issuance of a TRO is necessary to prevent further harm and ensure adherence to the rule of law.

**IV** **The Court Should Waive the Bond Requirement**

Rule 65 of the Federal Rules of Civil Procedure provides that, " [t]he court may issue a…temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined[.]" however it is also the case that, "the district court retains the discretion to set the bond amount as it sees fit or to waive the security requirement," *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Due to the recognized financial hardship it could present to the Plaintiffs and because the Defendant would not be harmed in anyway, the Plaintiffs should not be required to post a bond.

The plaintiffs in this case have been subjected to systemic constitutional and statutory violations, including procedural and substantive due process deprivations, extrinsic fraud, and violations of the Equal Protection Clause. The judiciary's failure to provide proper notice, suppression of key evidence, and financial misappropriation have resulted in irreparable harm, necessitating immediate judicial intervention. The misallocation of Title IV-D funds, fraudulent venue determinations, and deliberate efforts to undermine the credibility of the plaintiffs constitute grave violations of their fundamental rights. Moreover, the courts' refusal to enforce

VAWA-mandated protections has exacerbated the plaintiffs' vulnerability, exposing them to further harm. The balance of equities overwhelmingly favors the plaintiffs, as the defendants face no legitimate hardship from the issuance of injunctive relief. Case law from the Fourth District Court of Appeals and the Eastern District of North Carolina consistently supports the necessity of immediate intervention when due process rights are violated and judicial impartiality is compromised. Given the weight of the evidence, the legal precedent, and the statutory mandates at play, the issuance of a Temporary Restraining Order is not only justified but imperative to halt ongoing injustices and restore the plaintiffs' constitutional and statutory rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Katherine Moore, Amy Palacios, and Edyta Hannah Basista respectfully request that this Court grant the following relief:

1. Issuance of a Preliminary and Permanent Injunction

    a. Enjoining Defendant from enforcing or executing any orders determined in courts that did not adhere to fundamental tenants of constitutional fairness, that did not comply with the VAWA implementation plan for which they received funding, that expressly exhibit extrinc fraud in the process thereby denying Plaintiffs actual participation in their litigation and that resultantly improperly strip Plaintiffs of their custodial and decision-making rights over their minor children, including but not limited to those issued in violation of due process, equal protection, or federal law.

    b. Staying all pending proceedings in the state courts that involve the Plaintiffs' custodial rights and any orders that would inhibit their ability to exercise lawful parental decision-making, pending full adjudication of the constitutional violations alleged herein.

2. Immediate Sealing and Protection of Plaintiffs' and Their Children's PII

a. Ordering the immediate removal and sealing of any publicly disclosed Personally

Identifiable Information (PII) and confidential medical records belonging to Plaintiffs or

their minor children that have been improperly filed in public court records.

b. Directing Defendants to take immediate action to remediate and prevent any further

disclosure of such protected information, pursuant to the Privacy Act (5 U.S.C. § 552a),

HIPAA (42 U.S.C. § 1320d-6), and VAWA confidentiality provisions (34 U.S.C. §

12291(b)(2)).

3. Enforcement of Plaintiffs' Rights Under VAWA and ADA

a. Mandating the courts and their officers to comply with the Violence Against Women

Act (VAWA) and the Americans with Disabilities Act (ADA) by implementing proper

accommodations and protections to safeguard Plaintiffs' rights as survivors of domestic

violence and individuals with disabilities.

b. Prohibiting any adverse rulings, findings, or sanctions against Plaintiffs that stem from

the courts' failure to provide legally required protections and accommodations under 42

U.S.C. § 12101 et seq. (ADA) and 34 U.S.C. § 12291 et seq. (VAWA).

4. Invalidation and Stay of Unlawful Orders

a. Vacating or staying the enforcement of court orders obtained through extrinsic fraud,

deprivation of due process, or failure to comply with federal law, including:

i. Orders imposing improper financial sanctions against Plaintiff Palacios, entered

without proper notice or hearing in violation of due process under the Fourteenth

Amendment.

42

ii. Orders predicated on time-barred, fraudulent, or constitutionally infirm proceedings, including those arising from wrongful warrants, improper DNA collection, and fabricated cyberstalking claims against Plaintiff Basista.

iii. Orders limiting Plaintiff Moore's custodial and parental rights that were entered in violation of her constitutional due process protections, without full and fair adjudication.

5. Implementation of Safeguards Against Further Constitutional Violations

a. Requiring state courts and officials to implement procedural safeguards to ensure compliance with the Due Process Clause (U.S. Const. amend. XIV), Fourth Amendment protections against unlawful searches and seizures, and the Equal Protection Clause as they pertain to Plaintiffs.

b. Enjoining Defendants from further using fraudulent, time-barred, or procedurally defective criminal charges or findings to interfere with Plaintiffs' custodial rights or parental decision-making.

6. All Other Relief the Court Deems Just and Proper

a. Awarding such other equitable relief as necessary to prevent irreparable harm to Plaintiffs and their minor children, including but not limited to federal oversight or intervention to prevent ongoing violations of federal law.

Respectfully submitted,

Katherine Moore, J.D., M.S., CFE
3461 Lacewing Drive
Zebulon, NC 27597
(786) 797-0507
kmoore@protectivemoms.net


Anita Washington
5016 South Amherst Hwy,
Madison Heights, VA 24572
(252) 639-8999
anitawashington279@gmail.com


Amy Palacios, NP
3832 Grovesner Steet,
Harrisburg, NC 28075
(704) 579-7108
amypalacios79@gmail.com


Edyta Hanna Basista
5809 Magellan Way, Apt 203
Raleigh, NC 27612
(516) 446-0877
ehbasista@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certified that a true copy of the foregoing **PLAINTIFFS' AMENDED EMERGENCY MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO RULE 65,** to be served by mail to Chris D. Agosto Carreiro, Special Deputy Attorney General, N.C. Department of Justice, P.O. Box 629, Raleigh, NC 27602-0629

Katherine Moore, J.D., M.S., CFE
3461 Lacewing Drive
Zebulon, NC 27597
(786) 797-0507
kmoore@protectivemoms.net