IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 24-cv-00686

FILED
APR 11 2025
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | |
|---|---|
| Katherine Moore, et. al | ) |
| | ) PLAINTIFFS' MOTION FOR EXPEDITED |
| | ) CONSIDERATION AND SUUPLMENTAL |
| | ) DECLARATION |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Mike Silver in his individual and official | ) |
| capacity as Training and Services Director | ) |
| For the North Carolina Administrative | ) |
| Office of the Court | ) |
| | |
| Defendant | |

**PLAINTIFFS' MOTION FOR EXPEDITED CONSIDERATION AND SUPPLEMNTAL DECLARATION**

TO THE HONORABLE COURT:

NOW COME Plaintiffs, who respectfully move this Honorable Court to compel a prompt ruling on Plaintiffs' Motions for Preliminary Injunction, filed on December 30, 2024, and January 31, 2025, pursuant to Federal Rule of Civil Procedure 65, the Court's inherent equitable authority, and the fundamental rights guaranteed by the United States Constitution and applicable federal statutes. The matter is urgent and time-sensitive, as the illness presented in the Preliminary Injunction affecting Plaintiff Katherine Moore's minor child was untreated for an extended period of time and as a result, the child is experiencing grave and untreated medical issues, including a potential permanent disability, while state actors and the father continue to obstruct essential medical care.

1

## I. INTRODUCTION AND URGENCY OF REQUEST

This motion seeks immediate judicial intervention to compel a ruling on Plaintiffs' pending preliminary injunction motions. This motion raises significant constitutional and statutory claims concerning the safety, medical welfare, and rights of a now four-year-old child, whose preventable medical deterioration—including potential permanent hearing loss—continues unabated due to the Plaintiff mother's lack of medical authority and the father's willful refusal to obtain care.

The child's health continues to decline while the father, who has primary custody, denies access to medical care even when presented with outward symptoms of fever, chronic cough, sinus infections, and hearing loss. Plaintiff Moore is faced with an unconscionable dilemma: allow her child to suffer serious and potentially irreversible harm or risk contempt of court by obtaining emergency medical treatment.

The federal protections codified in VAWA, CAPTA, and federal due process doctrine are not optional guidelines—they are binding legal mandates. The continued delay in issuing a ruling on the pending injunctions is causing ongoing, irreparable harm, and this Court is empowered to act.

## II. FACTUAL BACKGROUND

Plaintiff Moore is the mother of a now four-year-old girl whose medical condition has become urgent. On Friday, November 1, 2024, Plaintiff Moore, mother, reached out to Scott Mills via email regarding concern over the baby's chronic cough and sinusitis. Scott Mills never replied, did not render medical aid to the child and did not take the child to the doctor. [Exhibit A].

November 11, 2024, Moore took the child to urgent care due to a chronic cough and sinus infection. Plaintiff Moore had reached out to the father, who held medical authority, and he refused to seek care for over a month. In November, the child was diagnosed with acute bilateral ear infections and prescribed an 10-day course of antibiotics. Hearing loss was observed at that time. The baby had been ill for approximately 4-6 weeks. Although the baby had been prescribed a ten-day course of treatment, Plaintiff Moore could not let the father know that the baby had received medical care against his wishes. As a result, Plaintiff Moore could only administer seven days of treatment because the act of taking the baby to the doctor subjected her to contempt. The father, Scott Mills, has requested on multiple occasions that the mother of the baby, Plaintiff Moore, go to jail including in an initial filing in the state action where no order to be violated even existed yet. In contravention of VAWA and several federally mandated protections, the state court has consistently placated the father's abuse. Plaintiff Moore had a very reasonable belief that this single deviation from the modification order to save her child's life, would result and could still result in contempt. There is no way any even partially functioning system should have this set of circumstances in mind as an intended result.

In March 2025, Moore again sought care for the child, who had a high fever. On March 2, 2025, Plaintiff Moore took the baby to Urgent Care as previous infection symptoms had never fully resolved. The treating physician expressed grave concern, particularly regarding the partially treated infection and worsening hearing loss. The treating physician was also concerned about the pain the child may be experiencing given the progression of the ear infection. The treating physician prescribed a 10-day treatment of amoxicillin again. Because the physician was aware of the custody situation, the physician advised Plaintiff Moore to give the baby 11.25mL

3

of the antibiotic twice a day for the time that the mother had the baby since she would not be able to administer the medicine for the full 10-day period.

On the evening of March 2, 2025, Plaintiff called Wake County EMS when the child's fever spiked to approximately 106°F. EMS responded to Plaintiff Moore's Zebulon home. The responding EMS personnel was great. Subsequent to rendering this aid, Wake County has refused to release the EMS records or even respond to Plaintiff Moore despite multiple requests and contacts. Plaintiff Moore has the right to the medical records per court order. Plaintiff Moore made the following contacts with Wake County EMS:

- March 2, 2025, actual call. EMTs arrived at approximately 9:45pm. They left without providing the 'receipt'.
- March 3, 2025, called (919) 856-6020 at 8:52 am. Call lasted 2 minutes. Tried every prompt. Left a message and requested a call back regarding medical documentation for the previous night's visit.
- March 3, 2025, (919) 876-2488 called at 1:21 pm call lasted 13 seconds.
- March 3, 2025, called (919) 856-6020 at 2:11. Chose option for every prompt and could not leave a message. Call lasted 2 minutes
- March 3, 2025, called (919) 876-6020 at 2:13. Tried every prompt. Left a message on attorney prompt, but since that was not the desired department, tried additional prompts as well. Plaintiff Moore did leave a message requesting medical records. Call lasted 10 minutes.
- March 6, 2025, called (919) 414-9945 at 6:17pm EST and left a message. The call lasted for 20 seconds.
- March 28, 2025, went by 10000 Durant Road, Wake County EMS Station 15. Rang the bell approximately 3 times over a 5 minute period. Personnel moved around but would not open the door or answer questions.
- March 28, 2025, called (919) 856-6020 at 12:57pm est. chose every prompt. Was unable to speak with a person or leave a message. Call lasted 3 minutes.
- March 28, 2025, called (919) 856-6020 at 1:01pm est. spoke with Marlon in billing. He attempted to get my information but stated that there was no record of a visit to my address. Call lasted 29 minutes.

Because Plaintiff Moore received no paperwork when Wake County EMS responded, nor has anyone ever returned her call or answered her when she visited a location, Plaintiff Moore has provides a transcript created by the online transcription service Transcription Puppy. Plaintiffs had no other *pro se* access to emergency transcription services. The transcript provided is of the

4

March 2, 2025, Wake County EMS visit to her residence to answer her call regarding the sick baby. [Exhibit B].

On March 7, 2025, the father's third and current live-in girlfriend in four years admitted—during a recorded exchange—that both she and the father were aware the child could not hear properly. Scott Mills has the baby call all of the live in girlfriends 'Mommy'. Father's email dated February 16, 2025, admits that the child has a 'stuffy nose'. Both parties minimized what was clearly a serious, persistent issue. The sinusitis triggered the cough that was observable to even the casual observer and present at all times. The third live-in girlfriend in four years got perturbed and aggressive while Plaintiff Moore was explaining the doctor visit to the father. A transcript of the exchange, including the admission that the father and his girlfriend knew that the baby could not hear is attached [Exhibit C]. Plaintiff Moore has emailed the father to have the child seen regarding the hearing loss and chronic infection. Still, no response or communication of any kind has been received nor has medical care has been rendered [Exhibit D].

Despite this well-documented, worsening medical condition, Plaintiff Moore still lacks authority to secure proper diagnostic testing or treatment, including critical assessments for hearing loss and sinus complications. If the Court does not act now, the child risks permanent medical damage.

### III. LEGAL STANDARD & ARGUMENT

**A. The Court Has Clear Authority Under Rule 65 to Expedite Ruling on a Motion for Injunctive Relief**

Federal Rule of Civil Procedure 65 permits the issuance of preliminary injunctions to prevent irreparable harm. A party is entitled to relief where they show:

1. A likelihood of success on the merits,

2. A likelihood of irreparable harm in the absence of preliminary relief,

3. That the balance of equities tips in their favor, and

4. That an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

Plaintiff has demonstrated actual and ongoing irreparable harm—as well as exhaustion of state remedies—which satisfies every element. As the Fourth Circuit emphasized in *Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013): "When a plaintiff suffers a serious medical condition that worsens or becomes irreversible without intervention, the injury is not compensable in damages, and injunctive relief is appropriate."

### B. Federal Courts Must Not Abstain Where Constitutional Rights and Federal Statutes Are Ignored

This case does not seek to overturn a custody ruling—rather, it seeks protection where federal statutes provide applicable protection. The state had the opportunity and previously failed to protect this child and all of the children in this litigation as a byproduct of the state's noncompliance with federal law and in contravention of Plaintiffs' constitutional rights.

### VAWA (34 U.S.C. § 12291(b)(8))

34 U.S.C. § 12291(b)(8) enacted through VAWA and reinforced by its 2022 Reauthorization provides a critical safeguard where, "No person shall be denied access to any program or activity funded in whole or in part with funds appropriated for this subchapter on the grounds that the person is or has been a victim of domestic violence, dating violence, sexual assault, or stalking." Further, subsection (b)(13)(C)(ii) of the same statute makes clear that federal funds under VAWA may not be used to support court or agency actions that penalize or disincentivize victims for seeking protection. "Unallowable activities include those that... penalize or impose additional requirements on victims of domestic violence who are seeking

6

court or law enforcement assistance." *Id.* These protections are triggered when state courts or agencies receiving VAWA funding take adverse action against a protective parent, particularly where that parent is seeking medical, legal, or physical safety for a child affected by domestic violence or neglect.

Plaintiff Moore has repeatedly attempted to seek medical care for her minor child, who has presented with severe and escalating symptoms (including a 106°F fever, bilateral ear infections, and apparent hearing loss). The father, who has medical authority, has refused care. In response to these circumstances, Plaintiff Moore faces contempt by the state court for independently obtaining care—even when the child was acutely ill. Such threats and penalties chill protective conduct and violate VAWA's clear directive against penalizing survivors who seek medical or legal protection. By doing so, the state court's actions condition Plaintiff's parental rights on silence or inaction, despite the child's serious medical need.

This conduct is the exact type of penalty VAWA seeks to prevent. As explained in *Nicholson v. Scoppetta*, 820 N.E.2d 840, 854 (N.Y. 2004), courts cannot penalize a parent for efforts to protect a child from harm without violating due process. A battered mother's attempts "…to prevent harm to her child may not, without more, be grounds for penalizing her where she is a victim herself and takes reasonable steps to protect the child." *Nicholson* has been cited nationally for establishing the constitutional dimension of penalizing protective parents, a principle which VAWA codifies federally.

Additionally, federal courts have recognized the enforceability of VAWA funding conditions in analyzing whether court systems are acting in a discriminatory or retaliatory fashion. In *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011), the court reiterated that Congress

7

may attach conditions to federal funding, and that failure to meet those conditions may render court or agency actions subject to injunctive or declaratory relief.

"Where the receipt of federal funds is conditioned on compliance with federal law, courts may enforce that condition to prevent discriminatory or unconstitutional application." If North Carolina's courts or agencies receive any portion of their operational or training funds through VAWA appropriations—such as grants from the Office on Violence Against Women (OVW) or NC Governor's Crime Commission—they are subject to § 12291(b)(8) and its anti-penalty provisions.

From a statutory and regulatory perspective, 34 U.S.C. § 10446 (Formerly 42 U.S.C. § 3796gg–4) provides for court-based programs to receive federal funds to improve handling of domestic violence cases. These programs must be compliant with VAWA standards, including non-penalization of victims. Under 28 C.F.R. § 90.4(b) Courts receiving OVW funding must adopt non-discrimination policies and ensure they do not penalize or discourage protective parents or victims from seeking help. 34 U.S.C. § 12291(b)(13)(C) explicitly prohibits the use of federal funds for activities that "jeopardize victim safety," or "deter or prevent physical or emotional healing for victims." Threatening a protective parent with incarceration or further defaming her for seeking medical treatment for a child clearly fits this definition.

Plaintiff Moore's situation exemplifies the harm VAWA was designed to prevent: a protective parent punished for seeking medical care when the other parent refuses. This conduct—especially under a judicial system funded in part by VAWA grants—is both a statutory violation under 34 U.S.C. § 12291(b)(8) and a constitutional concern under due process and equal protection principles. The federal court has the authority and responsibility to enjoin any

8

state action that violates these federally mandated conditions, particularly where a child's safety and welfare are at imminent risk.

**CAPTA**

CAPTA (42 U.S.C. § 5106a(b)(2)(B)): obligates state agencies to establish procedures to ensure appropriate care and timely medical evaluations. While CAPTA itself does not create a private right of action (*see Doe v. Connecticut Dept. of Child & Youth Servs.*, 911 F.2d 868, 869–70 (2d Cir. 1990)), it creates binding obligations for state agencies. Federal courts have routinely held that when a state accepts federal funds, it is required to comply with the statutory conditions attached to that funding. *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981). At a time when state child protection services around the country are facing unprecedented federal defunding, a case where the father refuses treatment such that he *creates* a permanent disability in his 4 year-old otherwise healthy daughter while the mother, Plaintiff Moore beseeches him to obtain adequate healthcare for the baby serves as an illustration that the currently funded mechanisms have utterly failed this child. CAPTA (42 U.S.C. § 5106a(b)(2)(B)) obligates state agencies to establish procedures to ensure appropriate care and timely medical evaluations. At present, these mechanisms have utterly failed this child.

Thus, even if Plaintiffs cannot sue directly under CAPTA, this statute informs the constitutional and statutory context in which Plaintiffs' claims under § 1983 and VAWA are analyzed. Courts have found that failures to comply with CAPTA-related duties may be evidence of systemic indifference or due process violations when child safety and welfare are implicated. *See Kenny A. v. Perdue, 218 F.R.D. 277, 285–86* (N.D. Ga. 2003) (finding CAPTA duties

relevant in evaluating whether systemic failures in Georgia's foster care system violated constitutional protections).

Additionally, the deliberate inaction of the father—despite actual knowledge of medical risk—combined with state court inaction, meets the standard for state-created danger or deliberate indifference, which are actionable under 42 U.S.C. § 1983. See Doe v. Rosa, 795 F.3d 429, 439 (4th Cir. 2015) (holding that failure of state actors to intervene in child neglect and abuse may give rise to substantive due process claims when state inaction increases risk of harm).

**I. ADA Implications**

ADA (42 U.S.C. § 12101 et seq.) prohibits discrimination and failure to accommodate individuals with disabilities, including undiagnosed hearing loss potentially caused by medical neglect. The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., was enacted to eliminate discrimination against individuals with disabilities and to ensure equal access to public services, accommodations, and opportunities. Congress explicitly recognized the need to protect those with actual or perceived disabilities, including children, and found that, "individuals with disabilities continually encounter various forms of discrimination, including... failure to make modifications to existing facilities and practices." 42 U.S.C. § 12101(a)(5). The ADA applies not only to people with medically confirmed disabilities, but also those "regarded as" having an impairment—even when no formal diagnosis exists. "The term 'disability' includes... being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C).

This provision is critical in the present case, where the child has not yet been able to receive formal hearing testing due to the father's refusal and the mother's lack of medical authority,

despite repeated medical indicators and observable symptoms suggesting significant hearing loss.

**II. ADA Protections for Children with Actual or Suspected Disabilities**

The ADA's broad remedial purpose has been applied to ensure children with suspected disabilities receive access to services and accommodations, especially where governmental systems—like state courts or public agencies—have decision-making power affecting their care. In PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001), the Supreme Court noted that: "The ADA's provisions should be construed broadly to effectuate its purpose of eliminating discrimination against individuals with disabilities." Although Martin involved public accommodations, the same interpretive principle applies to Title II of the ADA, which governs public entities, including courts and state agencies. Title II mandates that: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity." 42 U.S.C. § 12132. In Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998), the Court made clear that state-run institutions fall within the scope of Title II: "The text of the ADA provides no basis for distinguishing these programs, services, and activities... Title II unambiguously extends…to any person subject to the authority of a state agency."

Applying this reasoning here, a minor child who is unable to receive medical treatment or testing due to institutional barriers—such as a custody order that prevents care—is effectively being denied the benefit of health and child welfare services, in violation of Title II.

**III. Medical Neglect as Discrimination Under the ADA**

Courts have held that state inaction or indifference that results in denial of services to a person with a disability—particularly a child—is actionable under the ADA. In Ability Center v. City of Sandusky, 385 F.3d 901, 912 (6th Cir. 2004), the court stated: "Public entities must take affirmative steps to ensure that qualified individuals with disabilities are not denied meaningful access to the services they provide." Here, North Carolina courts and agencies have failed to take any such affirmative steps. This child has presented outward symptoms of hearing loss since at least November 2024. That hearing loss may be permanent due to lack of care and refusal to evaluate. The father was empowered to deny health care by the state court in Nash County. The baby now faces discrimination by being denied meaningful access to diagnosis and accommodation, including speech and language interventions. In *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013), the court held that failure to provide adequate auxiliary aids or services to hearing-impaired students violated the ADA, even where the school followed IDEA procedures, "The mere provision of a service is not enough. It must be effective and must ensure equal opportunity to gain the same benefit." In this case, no service has been provided at all, and the state's obstructive order, constitutes constructive denial of services based on disability or perceived disability.

## IV. "Regarded As" Prong: Applicability to Undiagnosed Hearing Loss

Importantly, the ADA also covers individuals who are "regarded as" disabled by a public entity. This provision was strengthened by the ADA Amendments Act of 2008, which broadened the "regarded as" standard to cover situations where: "An individual is subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). In this case, the father and third live-in partner have both acknowledged they

observed the child's hearing impairment. The mother has repeatedly raised concerns. The state courts served as an active barrier to provide a pathway for evaluation or accommodation where it stripped the mother of her medical authority even though she was the only person who ever provided insurance and tended to the medical needs of the baby for the entirety of her life. Since Plaintiff Moore has not had the medical or school decision making ability the baby has suffered potentially irreparable damage and is attending a school that would have observed and ignored or is so inadequate that basic powers of observation did not detect an infection that has persisted since October. This total inaction, despite the awareness of symptoms, meets the threshold for "regarded as" disability, yet no intervention or accommodation has occurred.

## V. Legal and Equitable Implications

The ADA was enacted to correct exactly this type of systemic exclusion, particularly for individuals with no voice or legal power—like a medically vulnerable child. The ADA, alongside Section 504 of the Rehabilitation Act (29 U.S.C. § 794), requires states to provide reasonable accommodation and avoid actions (or inaction) that result in effective exclusion from services. Failure to allow the mother to seek testing or evaluation places the state in violation of its ADA obligations, particularly under Title II, which applies to state court custody frameworks and related enforcement mechanisms.

The Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) imposes clear legal obligations on state actors—including courts—to prevent discrimination against individuals with disabilities, including children with suspected or undiagnosed hearing impairments. By failing to take action to ensure this child receives diagnostic evaluation or treatment—despite overt signs of disability and repeated requests—the state and its courts are unlawfully discriminating under the ADA. This analysis further supports the Plaintiffs' motion for injunctive relief and

underscores the federal interest in immediate judicial intervention to prevent further harm and denial of access to federally protected rights.

## 14th Amendment

14th Amendment Substantive Due Process protects the rights of parents to care for their children. See *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Santosky v. Kramer*, 455 U.S. 745 (1982). When states fail to protect children from medical neglect—particularly under custody orders that punish protective parents—federal courts are not only permitted but required to intervene to safeguard federally guaranteed rights.

## IV. REQUEST FOR RELIEF

Plaintiffs respectfully request that this Honorable Court:

1. Compel an expedited ruling on Plaintiffs' Motions for Preliminary Injunction (filed on December 30, 2024, and January 31, 2025);

2. Review all supporting documentation, including the Memo in Opposition to the Motion to Dismiss filed on March 3, 2025, and cured on March 4, 2025 with all plaintiffs' signatures and attached hereto. (The docket indicates that this Memo in Opposition to the Motion to Dismiss was filed on March 9, 2025, but it was March 3rd 4th of 2025) [Exhibit E];

3. Consider the urgency of the child's medical needs, the looming risk of permanent harm, and the federal protections at issue.

## V. CONCLUSION

This declaration is submitted solely to supplement the evidentiary record in support of Plaintiffs' motion for preliminary injunction. It does not alter the legal arguments previously submitted but highlights time-sensitive developments relevant to the Court's equitable determination.

Plaintiffs' request is not speculative. It is urgent, supported by medical evidence, and grounded in well-established federal law. The child at issue continues to suffer while awaiting judicial action. Time is not a neutral factor. The longer this Court delays, the greater the likelihood of irreversible damage to the child's health and hearing.

The Court has the authority and to act.


Respectfully submitted,

_____
Katherine Moore, J.D., M.S., CFE
3461 Lacewing Drive
Zebulon, NC 27597
(786) 797-0507
kmoore@protectivemoms.net


_____
Anita Washington
5016 South Amherst Hwy,
Madison Heights, VA 24572
(252) 639-8999
anitawashington279@gmail.com


_____
Amy Palacios, NP
3832 Grovesner Steet,
Harrisburg, NC 28075
(704) 579-7108
amypalacios79@gmail.com


_____
Edyta Hanna Basista
5809 Magellan Way, Apt 203
Raleigh, NC 27612
(516) 446-0877
ehbasista@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certified that a true copy of the foregoing **PLAINTIFFS' MOTION FOR EXPEDITED CONSIDERATION AND SUPPLEMNTAL DECLARATION,** to be served by mail to Elizabeth Curran O'Brien, Special Deputy Attorney General, N.C. Department of Justice, P.O. Box 629, Raleigh, NC 27602-0629 and addressed to the following:

Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. Department of Justice

This the 11th day of April, 2025

Katherine Moore, J.D., M.S., CFE
3461 Lacewing Drive
Zebulon, NC 27597
(786) 797-0507
kmoore@protectivemoms.net